## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SHAWNELL GLADDEN and PRINCESS WATSON, parent and next friend, C.C., a minor | DISTRICT OF COLUMBIA, et al. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Domiento C.R. Hill, Esq.
Roxanne D. Neloms, Esq.
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2000

ATTORNEYS (IF KNOWN)

---

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**
- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**⊙ C. Administrative Agency Review**
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

### ○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| | | | |
|---|---|---|---|
| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| | | | |
|---|---|---|---|
| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

20 USC 1400-1491 as amended Federal Question review of agency decision involving rights to Free Appropriate Public Education

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Check YES only if demanded in complaint    JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☐ If yes, please complete related case form.

DATE 2/15/08    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# Exhibit 1

# DC OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
## OFFICE OF COMPLIANCE & REVIEW
## STATE ENFORCEMENT & INVESTIGATION DIVISION
## STUDENT HEARING OFFICE
## CONFIDENTIAL

Jane Dolkart, Due Process Hearing Officer
1150 5th Street, S.E.
Washington, D.C. 20003
202-698-3819; 202-698-3825 (Fax)

## HEARING OFFICER'S DETERMINATION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| **Christopher Conrad** | ) | DATE OF HEARING: |
| DOB 4/28/2000 | ) | October 30, 2007 |
| Petitioner, | ) | |
| | ) | DATE OF COMPLAINT: |
| v. | ) | August 28, 2007 |
| | ) | |
| **The District of Columbia** | ) | ATTENDING SCHOOL: |
| **Public Schools,** | ) | Park View ES |
| Respondent | ) | |

**COUNSEL FOR PARENT/STUDENT:  Miguel Hull**

**COUNSEL FOR DCPS:            OGC**
                             **Rashida Wilson**

# HEARING OFFICER'S DECISION AND ORDER

## I. INTRODUCTION

CC is a seven year old student in the second grade at Park View ES. CC has not been found eligible as a disabled student under the IDEA. CC does have a 504 plan in place. This complaint was filed on August 28, 2007, alleging that DCPS has failed to provide CC with forty-two hours of occupational therapy as compensatory education, as agreed to at an MDT team meeting.

## II. JURISDICTION

This is a case brought solely pursuant to Section 504 of the Americans With Disabilities Act. The Individuals With Disabilities Education Improvement Act (IDEA), 84 Stat.175, as amended, 20 U.S.C. ¶ 1400 *et seq.*, 34 CFR Part 300 *et seq.*, and the D.C. Municipal Regulations, Chapter 30, Title V, Sections 3000, *et seq.* do not give the SEID and its hearing officers jurisdiction to hear Section 504 cases. See, e.g. *Clark County Sch. Dist.* 37 IDELR 169 (SEA NV 2002). Therefore this complaint must be dismissed for lack of subject matter jurisdiction.

## III. ORDER

It is hereby **ORDERED** that this case be **dismissed** for lack of subject matter jurisdiction.

This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.

_____
Impartial Hearing Officer

Date Filed: November 13, 2007

Date Issued: 11 - 13 - 07

# Exhibit 2

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)**
**SPECIAL EDUCATION PROGRAMS**

| | | |
|---|---|---|
| Princess Watson | ) | |
| On behalf of Christopher Conrad, a minor | ) | Hearing Officer Dolkart |
| DOB: April 28, 2000 | ) | Hearing October 30, 2007 |
| Attending School: <u>Drew Elementary School</u> | ) | Complaint August 28, 2007 |
| | ) | |
| v. | ) | |
| | ) | |
| District of Columbia Public Schools | ) | |
| | ) | |

**<u>Parent's Brief Regarding Jurisdiction In Cases Under "Section 504"</u>**

COMES NOW Princess Watson, parent of the above-referenced student, through

counsel, and respectfully submits this Brief.

**Issue**

Whether a Hearing Officer presiding under the auspices of the <u>State Education Agency</u>

<u>for the District of Columbia, State Enforcement and Investigation Division, Office of Special</u>

<u>Education Programs</u> (hereinafter "SEA/SEID") has the jurisdiction to hear a claim under <u>Section</u>

<u>504</u> of the <u>Rehabilitation Act of 1973</u> (hereinafter "Section 504")?

**Procedural Background**

Christopher Conrad is a seven-year-old student in the District of Columbia. He is not

classified for special education but has been classified for services pursuant to Section 504 of the

<u>Americans with Disabilities Act</u>.

On August 28, 2007, the parent, through counsel, filed a Due Process Hearing Request

with the <u>SEA/SEID</u> alleging that District of Columbia Public Schools (hereinafter "DCPS") had

failed to begin implementing a compensatory education plan that was developed in June 2007 by

a DCPS Multidisciplinary Team (hereinafter "MDT"). <u>See Exhibit CC-8  MDT Eligibility</u>

<u>Meeting Notes (6-25-06)</u>. The <u>SEA/SEID</u> scheduled a Due Process Hearing to take place on

1

October 30, 2007.

At the onset of the hearing, the presiding hearing officer, Jane Dolkart, Esq., raised the concern that she may not have jurisdiction to hear a claim brought solely under Section 504. Rather than stop the hearing at that point, however, Hearing Officer Dolkart allowed the parties to present their respective cases regarding the substantive issue in the complaint, and asked that the parties submit a written post-hearing brief on the issue of jurisdiction.

## Analysis

### A Hearing Officer under the SEA/SEID has the jurisdiction to hear a claim under Section 504.

Section 504 is a civil rights provision that prohibits agencies that receive federal funds from discriminating against persons with disabilities. With regards to education, Section 504 does not provide the same rights as the <u>Individuals with Disabilities Act</u> (hereinafter "IDEA"), which entitles qualifying students to receive "special education" and guarantees a Free Appropriate Public Education pursuant to an Individualized Educational Program. Instead, Section 504 only entitles a qualifying student to "equal access" to education through accommodations, modifications, and services.

With regards to procedural safeguards, the regulations pursuant to Section 504 require that a respective agency establish a system of procedural safeguards, which include the right to representation by counsel and "an impartial hearing" among other things. <u>34 C.F.R. § 104.36</u>. The regulations also provide that compliance with the procedural safeguards of the IDEA is a sufficient means of meeting the Section 504 procedural requirements. <u>34 C.F.R. § 104.36</u>. ("A recipient that operates a public elementary or secondary education program or activity **shall establish and implement**, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, **a system of procedural safeguards that includes** notice, an

opportunity for the parents or guardian of the person to examine relevant records, **an impartial hearing** with opportunity for participation by the person's parents or guardian and **representation by counsel**, and a review procedure. **Compliance with the procedural safeguards of section 615 of the Education of the Handicapped Act [now IDEA] is one means of meeting this requirement.**" Emphasis added).

The only question then, with regards to jurisdiction in this case, is whether there exists a separate set of provisions within the District of Columbia Municipal Regulations ("DCMR") establishing procedural safeguards pursuant to Section 504. A careful search of the DCMR by undersigned counsel has revealed that no such provisions exist. See D.C. Mun. Regs. tit. 5 § 3000.1 et. seq. Consequently, the IDEA's procedural safeguards must apply here such that the hearing officer in this case does indeed have jurisdiction. Moreover, with regards to the relief requested by the parent, namely funding for 42 hours of private occupational therapy, the courts in the District of Columbia have held that compensatory education is proper under Section 504. See, e.g., Bonner v. Lewis, 857 F.2d 559, 566 (9th Cir. 1988); Moore v. Warwick Public School District N. 29, 794 F.2d 322, 325 (8th Cir. 1986); Ciampa v. Massachusetts Rehabilitation Comm'n, 718 F.2d 1, 5 (1st Cir. 1983); Miener v. Missouri, 673 F.2d 969, 977-79 (8th Cir. 1982), cert. denied, 459 U.S. 909, 916 (1982); Nelson v. Thornburgh, 567 F.Supp. 369 (E.D.Pa. 1983), aff'd without opinion, 732 F.2d 147 (3d Cir. 1984), cert. denied, 469 U.S. 1188 (1985). See also Smith v. Robinson, 468 U.S. 992, 1020 n.24 (1984) ("courts generally agree that damages are available under § 504"). But see Marshburn v. Postmaster Gen., 678 F.Supp. 1182 (D.Md. 1988), aff'd without opinion, 861 F.2d 265 (4th Cir. 1988); Byers v. Rockford Mass Transit Dist., 635 F.Supp. 1387, 1391 (N.D.Ill. 1986); Shuttleworth v. Broward County, 649 F.Supp. 35, 38 (S.D.Fla. 1986). Accordingly, the parent respectfully requests that the hearing officer consider the evidence presented and find in her favor.

3

**Conclusion**

The procedural safeguards of the IDEA satisfy the federal requirement for procedural

safeguards under Section 504 in jurisdictions where there are no separate 504 safeguard

regulations. In the District of Columbia there are no 504 procedural safeguard regulations.

Accordingly, the hearing officer in this case has jurisdiction to hear the parent's 504 claim.

Respectfully submitted,

Miguel A. Hull

**Certificate of Service**

I HEREBY CERTIFY that on this 2nd day of November 2007, a copy of the forgoing
Brief was delivered to Rashida Wilson, Esq., DCPS Office of the General Counsel, 825 N.
Capitol St., NE, 9th floor, Washington, D.C. 20002 by facsimile: 202 442-5098/97.

Miguel Hull

4

```
*********************
***  TX REPORT  ***
*********************

TRANSMISSION OK

TX/RX NO             1010
RECIPIENT ADDRESS    96983825
DESTINATION ID
ST. TIME             11/02 15:19
TIME USE             00'42
PAGES SENT           5
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Juan J. Fernandez!+

---------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Tilman L. Gerald
Roxanne D. Neloms
Omar Karram
Jani Tillery
Kimberly Glassman
Seth Diamond
Maria Blaeuer
---------------------------------

# *FAX COVER SHEET*

DATE:       November 2, 2007

TO:         Hearing Officer Jane Dolkart, Esq.
            Care of Student Hearing Office
            District of Columbia Public Schools

FROM:       Miguel Hull, Esq.

PHONE:      (202) 442-5432

FAX NO:     (202) 698-3825

SUBJECT:    **Christopher Conrad DOB: 4/28/00 –Brief**

NUMBER OF PAGES INCLUDING COVER SHEET:    **FIVE**

COMMENTS:

```
                        ***********************
                        ***  TX REPORT  ***
                        ***********************


        TRANSMISSION OK

        TX/RX NO              1011
        RECIPIENT ADDRESS     94425098
        DESTINATION ID
        ST. TIME              11/02 15:20
        TIME USE              00'39
        PAGES SENT            5
        RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Juan J. Fernandez!+

Tilman L. Gerald
Roxanne D. Neloms
Omar Karram
Jani Tillery
Kimberly Glassman
Seth Diamond
Maria Blacuer

---
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:       November 2, 2007

TO:         Rashida Wilson, Esq.
            Office of the General Counsel
            District of Columbia Public Schools

FROM:       Miguel Hull, Esq.

PHONE:      (202) 442-5000

FAX NO:     (202) 442-5098/97

SUBJECT:    **Christopher Conrad DOB: 4/28/00 --Brief**

NUMBER OF PAGES INCLUDING COVER SHEET: __**FIVE**__

COMMENTS:

# Exhibit 3

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



# *ADMINISTRATIVE DUE PROCESS*
# *COMPLAINT NOTICE*

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.    INFORMATION ABOUT THE STUDENT:

Student Name:  Christopher Conrad            DOB:  April 28, 2000

Address:      424 55th St., NE, Washington, D.C. 20011

Present School of Attendance:      Drew Elementary School

Home School:                      Drew Elementary School
                                  (Neighborhood school where child is registered)

Parent/Guardian of the Student:  _Shawnell Gladden and Princess Watson_____

Phone:  (H) _202 277-2371/202 834-7293_   (W) _202 371-1928_____   (F) _____

**B.    Legal Representative/Attorney (if applicable):**

Name:  _ Miguel A. Hull, Esq._      Phone:  (W) _202 742-2015____   (Fax) _202 742-2098_

Address: _1220 L St., NW, #700, Washington, D.C. 20005_____

Will attorney / legal representative attend the resolution session?   **X** Yes            ☐ No

**C.    Complaint Made Against (check all that apply):**

**X** DCPS

☐ Charter school (name of the charter school if different from page
one)_____

☐ Non-public school or residential treatment facility (name)

_____

☐ Parent

**D.    Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint. I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

**X** I wish to waive the Resolution Session Meeting

**E.    Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

**I am requesting an administrative due process hearing only at this time.**

**G.        Facts and Reasons for the Complaint:**

**I.    Relevant Facts**

1.  Christopher Conrad is a seven-year-old student who just completed the 2006-07 school year at Drew Elementary School in the District of Columbia.

2.  According to his parents, Christopher has been diagnosed by his physician with Attention Deficit Hyper-activity Disorder and Oppositional Defiant Disorder ("ODD") and is

2

supposedly receiving services from District of Columbia Public Schools ("DCPS") pursuant to a "Section 504 Plan".

3.  During the second half of the 2006-07 school year, Christopher had serious behavioral problems that negatively impacted his educational progress. On more than one occasion, he disrupted his class by climbing on furniture and bothering the other students. He would also, on occasion, wander the halls of the school. Eventually, the behavior got so bad that, according to his parents, the school began to provide on-on-one attention and even then, he apparently would refuse to do his work.

4.  On June 25, 2007, the parents and their educational advocate appeared at Drew ES for a Multi-Disciplinary Team ("MDT") meeting to review occupational therapy and physical therapy assessments that had previously been done for Christopher. During that meeting, the determined that Christopher had not been provided with all of the occupational therapy called for by his IEP and that this omission had resulted in harm. The team then developed a compensatory education plan for Christopher to receive 42 hours of occupational therapy, which the team determined would begin within 30 days from the meeting. To date, however, DCPS has failed to begin providing the 42 hours of compensatory occupational therapy.

## II.  **DCPS Has Failed To Implement The Compensatory Education Plan Developed In June 2007.**

5.  DCPS has failed to begin implementing the compensatory education plan that was developed in June 2007.

6.  "Under the theory of "compensatory education" courts and hearing officers may award "educational services . . .to be provided prospectively to compensate for a past deficient program." Reid v. District of Columbia, 401 F. 3d 516 (D.D.C. 2005); quoting G. ex rel. RG v. Fort Bragg Dependent Schls., 343 F.3d 295, 308 (4th Cir. 2003). See also Miener v. State of Missouri, 800 F2d 749, 753 (8th Cir. 1986); and Burr v. Ambach, 863 F. 2d 1071 (2nd Cir. 1989).

7.  In Reid v. District of Columbia, 401 F.3d 516 (D.C. Cir. 2005) the Court reasoned that "[a]ccordingly, just as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individualized assessments… this flexible approach will produce different results in different cases depending on the child's needs. Some students may require only short, intensive compensatory programs targeted at specific problems or deficiencies. Others may need extended programs, perhaps even exceeding hour-for-hour replacement of time spent without FAPE."

8.  Here, the MDT team met on June 25, 2007 and determined that DCPS had not provided Christopher with all occupational therapy to which he was entitled. The team also determined that this omission had harmed Christopher and that he should receive 42 hours of compensatory occupational therapy to begin with 30 days such that Christopher continues to be harmed.

### III. Relief Sought.

9.  that DCPS be ordered, or agree, to:

    a.  fund 30 hours of private occupational therapy that determined appropriate by the team during the MDT meeting on June 25, 2007, but that has yet to be provided.
    b.  that DCPS provide any other relief deemed appropriate and relating to the violations committed here; and
    c.  pay parent's reasonable attorney's fees and costs.

10. All meetings shall be scheduled through counsel for the parent, Miguel A. Hull, Esq. in writing, via facsimile, at 202-742-2097 or 202-742-2098;

11. Provide the student with a due process hearing within 20 calendar days of a request on any issue arising out of the noncompliance with the DCPS' obligation hereunder, or any disagreement with the assessment, programming or placement the parent may have;

12. In the event that the DCPS shall fail to comply with the terms herein, then under the Conciliation Agreement, the parents shall have the authority to use self help without further notice to the DCPS, and initiate an IEP with the DCPS' invited participation, and unilateral placement in an interim school or educational program until such time the DCPS can come into compliance and properly assess, program and/or participate;

13. The DCPS shall ensure that this student has available a Free and Appropriate Public Education including special education, transportation D.C.Mun. Regs. tit. 5 § 3000.3. and other related services as are defined at 34 C.F.R. § 300.34 & 39; Assistance to States for the Education of Children with Disabilities, 70 Fed. Reg. 35782, 35836 (June 21, 2005) (to be codified at 34 C.F.R. pt. 300), designed to meet this student's unique needs and preparation for employment and independent living;

14. Provide counsel for the parent with copies, pursuant to D.C. Mun. Regs. tit. 5 § 3021.8, of all evaluation reports and all educational records on the student no later than sixteen business hours prior to the convening of any meeting;

15. That DCPS within ten (10) calendar days of the filing of this complaint, pursuant to the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1415 (c) (2) (B), provide the parent's representative, Miguel A. Hull, Esq., via facsimile, at 202-742-2097 or 202-742-2098, the following: i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that DCPS considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action;

16. That DCPS, in the event they fail to answer/respond to the issues alleged in the parent's administrative due process hearing complaint, within ten (10) calendar days, the arguments

and facts as averred by the parent will be deemed true and accurate and act as a waiver, on the part of DCPS, for their desire to have a Resolution Session Meeting, and the parent's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA;

17. That DCPS, within fifteen (15) calendar days of receiving the parent's complaint, pursuant to the <u>Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1415 (c) (2) (C)</u>, respond to the parent's request alleging any insufficiency of notice;

18. That DCPS' failure to comply with the <u>Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1415 (c) (2) (C)</u>, and allege any insufficiency of the parent's administrative due process complaint, will constitute waiver on the part of DCPS to make such argument at any later date and time;

19. That DCPS, pursuant to the <u>Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1415 (f) (1) (B)</u>, within fifteen (15) calendar days of receiving the parent's administrative due process complaint, shall contact the parent's representative, in writing, via facsimile, at 202-742-2015 or 202-742-2098, to schedule and convene a **Resolution Session Meeting**.

20. That DCPS, pursuant to the <u>Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1415 (f) (1) (B)</u>, convene the Resolution Session Meeting, with the parent, the parent's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. That the relevant members of the MDT/IEP Team that shall be present at the **Resolution Session Meeting for the student shall include the following persons:** 1) the student's special education teacher, if applicable, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student, and 6) any service providers for the student; and

21. That DCPS' failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified according to the <u>Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1415 (f) (1 )(B)</u> constitute joint waiver between DCPS and the parent to have such meeting and the forty-five (45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the parent's counsel.

## G.    <u>Accommodations and Assistance Needed:</u>

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)_____
- Special Communication (please describe the type)_____

- Special Accommodations for Disability (please be specific)_____
- Other_____

**H.     Signature:**

Legal Representative / Advocate (if applicable)

August 28, 2007
Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC  20002**
**Fax number: 202/442-5556**

6

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO              2546
RECIPIENT ADDRESS     96983825
DESTINATION ID
ST. TIME              08/28 16:06
TIME USE             02'15
PAGES SENT            15
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Juan J. Fernandez!+

------------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Tilman L. Gerald
Roxanne D. Neloms
Omar Karram
Jane Tillery
Kimberly Glassman
Sctl. Diamond
Maria Blaeuer

----- ---------------------------

# FAX COVER SHEET

DATE:       August 28, 2007

TO:         Student Hearing Office
            District of Columbia Public Schools

FROM:       Miguel Hull, Esq.

PHONE:      (202) 442-5432

FAX NO:     (202) 698-3825

SUBJECT:    **Christopher Conrad DOB: 4/28/00  –Due Process Complaint**

NUMBER OF PAGES INCLUDING COVER SHEET:   **SEVEN**

COMMENTS:

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended

```
*********************
***  TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO               2547
RECIPIENT ADDRESS      96983825
DESTINATION ID
ST. TIME               08/28 16:09
TIME USE               01'02
PAGES SENT                7
RESULT                 OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Tilman L. Gerald |
| Domiento C.R. Hill | 1220 L Street, NW | Roxanne D. Neloms |
| Roberta Gambale | Suite 700 | Omar Karram |
| Miguel A. Hull | Washington, DC 20005 | Jani Tillery |
| Christopher L. West | Telephone: (202) 742-2000 | Kimberly Glassman |
| John A. Straus | Facsimile: (202) 742-2098 | Seth Diamond |
| Juan J. Fernandez!+ | e-mail: Admin@Jeblaw.biz | Mara Blaeuer |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:      August 27, 2007

TO:        Student Hearing Office
           District of Columbia Public Schools

FROM:      Miguel Hull, Esq.

PHONE:     (202) 442-5432

FAX NO:    (202) 698-3825

SUBJECT:   **Christopher Conrad DOB: 4/28/00 –Due Process Complaint**

NUMBER OF PAGES INCLUDING COVER SHEET: ___**SEVEN**_____

COMMENTS:

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended

# Exhibit 4

**CONABOY AND ASSOCIATES, INC.**
*Resources for Children and Families*
705 8th St. SE
Suite 200
Washington, D.C. 20003
Kristin@conaboy.com - www.conaboy.com
Phone 202.544.2320 Fax 202.544 2321

---

## COMPREHENSIVE OCCUPATIONAL THERAPY EVALUATION

**Name:** Christopher Conrad
**Chronological Age:** 6y. 0 m.
**Date of Evaluation:** 04/21/06

**Date of Birth:** 04/28/00
**Therapist:** Patrice A. Brown, M.S.A.,OTR/L
**Educational Program:** Drew Elementary

**Background Information:** Christopher is a 6 year old student who currently attends Drew Elementary School in Washington, D.C. An Occupational Therapy Evaluation was conducted at the request of Marshall Lammers, Esq., the special education attorney who represents Christopher and his individualized learning needs. A review of the student Evaluation Plan (SEP) dated 04/13/05 summarizes areas of concern as problems with attention behaviors. Additionally, the SEP indicated that Christopher's physician identified him as having ADHD combined type, Graphomotor Disorder, Sleep Disorder, and Oppositional Defiant Disorder.

The present evaluation was conducted to identify Christopher's current levels of sensory, motor and visual perceptual/motor functioning and to determine his need for Occupational Therapy Intervention. It should be used in part to support the need to develop an appropriate plan for service delivery so as to improve upon Christopher's capacity to achieve his highest level learning and enhance his classroom performance.

**Evaluations Administered:**
- Clinical Observations
- Review of records
- Consultation with Patricia Jones, Classroom Teacher
- School Age Checklist for Occupational Therapy
- The Beery-Buktenica Developmental Test of Visual Motor Integration (VMI)
- Brunininks-Oseretsky Test of Motor Proficiency –
  Bilateral Coordination, Upper-Limb Coordination, and Fine Motor Subtests

**Clinical/Behavioral Observations:** This evaluation was completed in Christopher's school environment. Christopher accompanied this unfamiliar examiner without any difficulty and attended nicely to the presented tasks with some redirection. He was well mannered, quickly established rapport and was willing to try most tasks. Christopher required prompting to remain seated in between testing trials. He was easily distracted by visual stimuli in the testing environment and made attempts to negotiate playing with objects in the testing room upon completing minimal testing items. With cueing he was able to redirect his attention to testing. Christopher is also noted to have significant difficulty in the area of emotional/behavioral functioning. Christopher is described by his teacher, Ms. Jones, as frequently having difficulty with: accepting changes in

Christopher Conrad
Occupational Therapy Evaluation
Page 2 of 9

routines, becoming frustrated, getting along with other children, performing in large group settings, playing within a group, displaying marked mood variations, such as outburst or tantrums, and establishing eye contact. Additionally, Ms. Jones indicates that Christopher struggles in the area of organization and is unable to maintain personal space, desk area, or book bag in an age appropriate manner. Christopher is also frequently unable to finish tasks. Christopher's difficulties, particularly in the area of fine motor development have likely significantly contributed to how he feels about himself as a student and his abilities to succeed and learn when faced with school-based tasks.

It is imperative that Christopher experience structured academic and remediation activities with support to assist him in achieving academic success. He requires functional skill development to build a foundation of self esteem, self-confidence, and self awareness which will assist him to develop higher level academic skills and independent functioning within the school environment.

- **Sensorimotor Functioning:** Successful sensorimotor functioning is the ability to take in, interpret, and use information from the environment appropriately. Per responses on the *School Checklist for OT Services*, Christopher presents with some difficulties in tactile (touch) processing. He seems overly sensitive to being touched and pulls away from light touch. He also has trouble keeping his hands to self and will poke or push other children. He can be observed to touch things constantly and appears to learn through his fingers. He is able to take in and tolerate most movement (vestibular) activities; however he does seem to fall frequently as reported by Ms. Jones and appears to be in constant motion, is unable to sit for activities, and can be difficult to redirect at times. He appears to have some proprioceptive system difficulties as he utilized improper force when manipulating classroom tools (i.e. pencil pressure). Christopher appeared to have minimal difficulty processing auditory information (making sense of what he hears) and is frequently distracted by sounds. He was able to initiate eye contact with this therapist but had difficulty maintaining it. He was able to separate head and eye movements to track objects across his field of vision and cross midline when appropriate to task. However, he had difficulty taking in and responding appropriately to some visual information. An Opthalmological Evaluation is recommended to rule out any vision difficulties. Difficulties processing sensory information may impact upon Christopher's ability to perform in his educational environment.

- **Motor Proficiency:**

Gross motor skills (movements of the large muscles) were assessed through the use of clinical observations and subtests from the Bruininks-Oseretsky Test of Motor Proficiency (B&O). Christopher was able to move adequately around his school environment. When engaged in motor tasks, Christopher demonstrated a right arm and leg preference, although he confused the left and right body sides. He demonstrated age-appropriate hopping, jumping, skipping, and running. He presents with below average abilities with regards to balancing (ability to balance on a low beam with eyes opened) and bilateral coordination

Christopher Conrad
Occupational Therapy Evaluation
Page 3 of 9

(using upper/lower, right/left extremities together in a coordinated fashion).   This deficits may impact his ability to complete refined fine motor tasks.

Fine motor skills (movements of small muscles) were assessed using consultation, clinical observations, and fine motor subtests from the B&O.  When compared to other students his age, Christopher achieved skills as follows:

### Bruininks-Oseretsky Test of Motor Proficiency

| Subtest | Age Equivalent | Standard Score | Definition of Terms | Performance Range |
|---|---|---|---|---|
| Response Speed | 6 years, 11 months | 17 | Ability to respond to a quick moving stimulus | Average |
| Visual Motor Control | 5years, 5 months | 10 | Cutting and drawing lines within narrow boundaries.  Copying geometric shapes | Below Average |
| Upper-Limb Speed and Dexterity | 4 years, 5 months | 13 | Arm and hand speed and control with small items: pegs, coins, cards, beads, and quick pencil tasks | Low |
| | | | Overall Fine Motor Skill Performance = | Below Average |

- **Interpretation:** According to the B & O Christopher's fine motor skills fall within the below average range when compared to other children his age. Christopher displays difficulty coordinating finger, hand, and eye movements for refined tasks such as writing, cutting, and manipulation and displacing small items.  His classroom teacher reports that he experiences a tremendous amount of difficulty manipulating scissors, however his scissor use improves with continue trials and repetition.  He additionally demonstrates difficulty when asked to use his writing tool in a controlled manner to produce specific output, for example, accurately copying information or smoothly tracing through a narrow path that changes direction.  He has difficulty working in a left to right direction and is observed to produce segmented output, frequently lifting his pencil, shifting his body, using of large arm movements as opposed to refined wrist and finger movements when writing, and increased pressure applied to the pencil when tasks are challenging.

While Christopher made fair efforts on all fine motor and manipulative tasks he achieved overall fine motor skills within the below average range when compared to other children his age.  Fine motor tasks are difficult for him and contribute to the difficulties he experiences within the classroom environment. Especially given his young age, he will benefit from exposure to related fine motor and remediation activities (i.e. drawing, coloring, cutting, gluing, tracing, painting etc), a pencil grip, a clear letter/number strip, and extended writing and test taking time.

- **Handwriting Skills:** Christopher's handwriting skills were assessed through clinical observations and informal handwriting samples. Christopher is right hand dominant and utilizes a functional tripod grasp when writing, with extended fingers and an elliptical web.  When performing paper/pencil tasks, he requires cues to stabilize the paper with his non-writing hand to eliminate the writing surface from shifting when writing.  Consistent with teacher reports he applied increased pressure to the pencil when writing which can limit mobility and

Christopher Conrad
Occupational Therapy Evaluation
Page 4 of 9

fluid writing pattern as well as cause him to fatigue quickly when engaged in writing or other pencil and paper tasks.   During an informal writing task Christopher's writing displayed deficits with correct letter formation, alignment of letters, sizing and spacing. Christopher terminated the writing task indicating that he was tired and did not want to write anymore, despite encouragement by this evaluator to complete the task he initiated.  Christopher demonstrates poor desk posture and avoidance of activities involving drawing, coloring, cutting, and copying as these present as great challenges to him.

   Paired with specialized instruction Christopher would benefit from classroom instruction and participation in a structured handwriting program (see recommendations) to assist in proper handwriting development and providing him with a solid handwriting foundation to promote accuracy and efficiency.  He may also benefit from use of a clear, well organized letter strip placed at his desk to reference when writing, and extended time to complete written tasks.

- **Visual Motor Integration /Visual Perceptual Skills:** Visual Motor and Visual Perceptual skills were assessed using The Developmental Test of Visual Motor Integration  (VMI) and clinical observations  Good visual motor integration is well coordinated visual perception and finger-hand movements.

   The VMI is used to help identify significant difficulties that some children have in integrating, or coordinating, their visual perceptual and motor (finger and hand movement) abilities.  The results are as follows:

### The Developmental Test of Visual-Motor Integration

| Category | VMI Overall | Visual Perception Section | Motor Section |
|---|---|---|---|
| Raw Scores | 13 | 15 | 18 |
| Standard Scores | 81 | 83 | 101 |
| Scaled Scores | 6 | 7 | 10 |
| Percentiles | 10 | 13 | 53 |
| Age Equivalents | 4 years, 10 months | 4 years, 8 months | 6 years, 0 months |
| Performance  Range | Below Average | Below Average | Average |

- **Interpretation:** As revealed in Christopher's scores, he exhibits overall visual motor integration skills within the below average range. The visual component required Christopher to choose one geometric form among competing forms to match the initial stimulus.   The motor component required him to trace the stimulus forms accurately, without going outside double-lined paths.  The overall piece required integration of both visual and motor information.  Christopher's responses tended to be quick and he exhibited a disorganized approach to the paper, requiring moderate cuing not to skip items and move in an appropriate left to right pattern across the paper.  As items became more difficult, Christopher clearly recognized that he was unable to complete the task accurately.  It appears as though Christopher has difficulty integrating or coordinating the visual perception and visual motor domains.  This is functionally evident when Christopher is required to copy information from a

Christopher Conrad
Occupational Therapy Evaluation
Page 5 of 9

model or copy and cut out geometrical shapes and could impact his performance in tasks related to reading, handwriting, and developing foundational math skills. This is additionally consistent with his performance on the <u>Bruininks-Oseretsky Test of Motor Proficiency, Visual Motor Subtest.</u>  These impairments may impact upon his ability to acquire higher level learning and to succeed in the classroom environment.

   Christopher's visual perceptual abilities were additionally, informally assessed through clinical observations and consultation with his classroom teacher. Visual perceptual skills are the ability to perceive, process, and respond to objects.  It is the capacity to interpret or give meaning to what is seen.  According to Ms. Jones Christopher has been observed to have difficulties at times with, completing puzzles, reversal of words, letters, and numbers.  During an informal writing task Christopher wrote the numbers 1-10 without a model and reversed 5 out of the 10 numbers.  When given a model he was able to self-correct reversals and copied 10 out 10 numbers without the presence of reversals.  Christopher was able to identify basic shapes and colors for this evaluator.  During testing Christopher asked if he could draw a person on the chalk board.  When given the opportunity to draw on the board he drew a person with a circular head, triangular body, horizontal lines for arms, small circles for hands, vertical lines for legs, and small circles for feet.   Overall Christopher appears to exhibit some deficits in the area of visual perception which is consistent with results from the <u>VMI</u> which indicate below average abilities.  Visual Perceptual deficits can impact functional tasks within the learning environment such as handwriting development, copying from the board, lining up math calculations, sequencing, understanding more abstract math concepts (shapes), keeping a place when reading, sound and symbol recognition, or with spelling tasks.

- **Summary:**  Christopher is a 6 year old student who currently attends Drew Elementary School.  According to Christopher's teacher he presents with relative strengths in the areas of reading, math, and his ability to remember information.  Deficit areas include his emotional/behavioral functioning, gross motor skills related to balancing and bilateral coordination, fine motor skills, organization, and sensory processing.

   It appears as though Christopher would respond well to an encouraging, well structured environment with proper classroom accommodations and assignment adaptation.   He was well mannered and exhibited difficulties with attentiveness.   Due to observations, the interpretation of testing scores, record review, and information provided by school personnel, this assessment indicates that Christopher is a candidate for direct Occupational Therapy services to assist him in development of classroom strategies and compensatory techniques for his deficits and to provide him with classroom support to enhance overall learning. Intervention should focus on developing age appropriate fine motor skills, improving visual perceptual/motor skills, improving overall handwriting skills, and improving sensory processing.

- **Recommendations:**

Christopher Conrad
Occupational Therapy Evaluation
Page 7 of 9

> pull or opportunities to draw while listening to the lesson, lecture, or story being read .  Many of these or similar items can be found in dollar stores, toy stores or various options can also be ordered from Sammons Preston at 1.800.323.5547.

e.  Christopher may pay better attention and self regulate with supervised oral motor stimulation.  Classroom staff and parents may want to consider allowing Christopher to chew bubble gum, chewing wax, or have a pencil chew tops (different plastic characters to fit on the eraser ends of the pencil or tie a knot of

Christopher Conrad
Occupational Therapy Evaluation
Page 6 of 9

1.  **TEAM:**  Review of this report with classroom staff, related service providers, and caregivers.

2.  **OCCUPATIONAL THERAPY:**
An Occupational Therapist should provide direct OT services for 2x/week for 30 minutes to improve deficit areas and assist with developing classroom accommodations to enhance overall academic and classroom performance. Intervention should be well integrated into classroom programming to promote carryover and skill development.  The focus of intervention should be to:

a.  Provide an Occupational Therapy sensory-motor program consisting of direct individual OT services 2x/week for 30 minutes to promote age appropriate motor and handwriting development and to improve visual perceptual/motor skills thereby enhancing overall academic and classroom performance.

b.  Provide structured handwriting program.  *Handwriting Without Tears* is one good program which includes pre-writing and basic printing activities. It is available at www.hwtears.com

c.  Use of a Pencil Grip to improve pencil grasp and pressure.  *The Pencil Grip* is one good option and available at www.abilitations.com.

d.  Provide sensory processing strategies to assist with improving ability to make meaning of sensory information in his environment (i.e. visual and auditory accommodations).

e.  Explore and introduce sensory and movement accommodations to increase modulation, decrease non-purposeful movement, and increase attention to the classroom environment.  Christopher may  benefit  from the following:

> a.  Taking movement breaks during challenging classroom work. Breaks may include: 2 minutes of jumping in the hallway or on small trampoline, earned playground swing time or basketball shots (outside or with inside hoop), being the teachers helper to run errands, erasing the board, do "heavy work" (i.e. moving furniture), or routinely passing out materials to prepare for activities.

> b.  Christopher may benefit from the use of sitting on a T-Stool, a Small Sit Fit Movement cushion for his chair, or a large ball.  These allow slight amounts of movement while seated at desk or table during activities and may encourage increased attention/arousal to task.  All can be ordered from Sammons Preston at 1.800.323.5547.

> c.  A Disc'O Sit in another in chair movement cushion that may assist Christopher with improving his posture and attention to task.  A Movin'Sit wedge is another option available to assist with preventing slouching and aligning the body for desk top activities and improved writing posture.  Both are available from Sportime Abilitations at 1.800.850.8602 or www.abilitations.com.

> d.  Christopher may respond to the use of fidgets at his desk.  Some fidget options include, silly putty, koosh balls, textured materials, small stress balls, tennis ball to squish, or theraband or tubing to

Christopher Conrad
Occupational Therapy Evaluation
Page 8 of 9

   i. Encouragement to maintain proper desk and writing posture (appropriate chair and desk height, forearm and elbow on table, opposite hand stabilizing paper, proper paper tilt), and to proofread written work for spelling, grammar, and sentence structure.
   j. Limit excessive materials on desk/table/work area.
   k. Limit auditory distractions (T.V.s, fans, side conversations) to improve attention span and promote optimal auditory processing.
   l. Provide Christopher with a visual chart of daily expectations
   m. Provide opportunities to earn playground time or "movement breaks' to promote increased overall motor development and coordination.
   n. Provide opportunities for Christopher to earn special rewards/privileges (i.e. stickers, bubbles, small toys) for attention span, good behavior, volunteering information and general class participation.
   o. Provide Christopher with opportunities to be the "teacher helper" when needing to rearrange classroom furniture, moving books or boxes, running errands to another teacher. All movement and resistive activities will help him to encourage increased attention when retuning to task.
   p. Provide increased encouragement, positive reinforcement, praise and acceptance to encourage improved self-esteem and self-confidence in abilities.
   q. Christopher will benefit from overall coordination, fine motor and manipulative activities. For example:
      i. Sorting and manipulating small objects, fasteners, coins/pocket change, silverware, recycling etc.
      ii. Lacing activities: lacing cards, beads, dry pasta, patterns, leather activities, shoe strings etc.
      iii. Color/paint by numbers activities
      iv. Drawing or tracing art activities; sharpening pencils with small hand held pencil sharpeners
      v. Games (i.e. Mastermind Jr, Battleship, PickUp Sticks, Jenga, Connect Four)
      vi. Completing basic model cars, trains, or airplanes
      vii. Complex Puzzles, Legos, Knex, or other building toys
      viii. Arts and Craft activities (i.e. latch hook, basic sewing, painting sun catchers)
      ix. Modeling clay
      x. Folding and putting away laundry
      xi. Serving plates, pouring drinks family style during meals, opening/closing small containers
      xii. Basic cooking and baking activities
      xiii. Climbing equipment such as jungle gym bars increase overall hand and upper body strength
      xiv. Squeeze bottles for cleaning, watering plants etc.

Christopher Conrad
Occupational Therapy Evaluation
Page 9 of 9

## 4. FURTHER EVALUATIONS/FOLLOW UP RECOMMENDATIONS:

a. An Opthalmological Evaluation is recommended to rule out any vision difficulties.

b. Formal or Informal re-evaluation in one year to monitor progress, update goals, and determine need for continued intervention.

It has been a pleasure working with Christopher, Mr. Lammers, Ms. Jones, and the Drew Elementary School personnel. If I can be of further assistance, please do not hesitate to contact me at 202.544.2320

**Patrice A. Brown, M.S.A., OTR/L**
**Senior Occupational Therapist**
**Evaluator**

**Kristin S. Conaboy, OTR/L**
**Occupational Therapist**
**Board Certified Disability Analyst**

# Exhibit 5

**District Of Columbia Public Schools**
**Division of Special Education**
**Local Education Agency**
**Occupational/Physical Therapy Programs**
**(202) 576-7108**
**Physical Therapy Screening**

**Name:** Christopher Conrad

**DOB:**

**Parent's Name:** Princess Watson

**Address:**

**Phone Number:**

**Therapist:** B. Lancaster, MPT

**Date:** 12/22/05

**School:** Drew ES

**Teacher:**

**History:** Christopher was referred for a physical therapy evaluation. However, the referral states that he has difficulty with fine motor skills such as writing and grasping a pencil or crayon. Christopher was screened to determine the necessity for a P.T. evaluation.

**General Observation:**

Christopher was observed in his school environment. His gross motor skills such as running, walking, jumping, and ball skills were observed. Christopher independently ambulated throughout the hallways. He was able to ascend the steps with and without the use of a rail safely using a consistent reciprocal gait pattern. Christopher descended the stairs using a consistent step-to-gait pattern with the use of one rail for safety. He exhibited the ability to hop and gallop with good coordination; however, he exhibited some difficulty with skipping. Christopher showed the ability to catch, throw, kick and bounce a ball with good motor planning and coordination. He also exhibited the ability to run with reciprocal arm and leg movement and good trunk rotation. According to the teacher, Christopher plays safely and independently amongst his peers on the playground. He is also able to independently retrieve his lunch and dispose of his lunch tray after eating. There are no current observed difficulties with gross motor skills.

**Recommendation:** Based upon this screening and consultation with Christopher's teacher, a physical therapy evaluation is not recommended at this time.

*B. Lancaster, MPT*

B. Lancaster, MPT

# Exhibit 6



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

Office of Special Education
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

## D.C. Public Schools
## Department of Special Education
## Psychoeducational Report

### Confidential

**Name:** Christopher Conrad
**Age:** 5 years 00 months
**Date of Birth:** 4/28/2000
**Date of Evaluation:** 5/24/2005
**Date of Report:** 5/30/2005
**Grade:** non-attending
**School:** Drew ES
**Student ID:** 9204775
**Examiner:** Kirsten Myers Denning
**School Psychologist:** School Psychologist

**Reason for Referral:**

Christopher was referred for evaluation to determine if any disabilities exist. His parents were concerned about his attention and concentration. He currently attends Peaches and Cream daycare.

**Test Administered:**

Kaufman Assessment Battery for Children- Second Edition
Kaufman Test of Educational Achievement-Second Edition

**Test Observation and General Behavior**

Christopher is a 5 year 00 month old student who attends Peaches and Cream Daycare. He presented himself as a friendly, engaging student willing to participate in all activities presented to him. He engaged this examiner in casual conversation throughout the entire assessment process. Christopher was able to count appropriately for this examiner, sing the alphabet song from A-Z, and identify basic colors and shapes for this examiner. Throughout the assessment

---

*Children First*

2

process Christopher displayed appropriate attention and concentration. At on point in the evaluation Christopher picked up a toy car in between books however once this examiner indicated testing was to begin again Christopher immediately put the toy car back. Rapport was established and considered adequate for a valid assessment.

## Summary of KABC-II

| Global Scales | Score | Qualitative Description |
|---|---|---|
| Sequential | 88 | Average |
| Simultaneous | 92 | Average |
| Learning | 84 | Below aver. |
| Knowledge | 82 | Below aver. |
| Mental Processing Index | 86 | Average |

## Sequential Processing

| Subtests | Scaled Score | Age Equivalent |
|---|---|---|
| Number Recall | 8 | 4-2 |
| Word Order | 8 | 3-10 |
| Hand Movement | 10 | 5-0 |

## Simultaneous Processing

| Subtests | Scaled Score | Age Equivalent |
|---|---|---|
| Conceptual Thinking | 7 | 4-2 |
| Face Recognition | 10 | 4-10 |
| Triangles | 8 | 4-2 |
| Pattern Reasoning | 11 | 5-4 |
| Gestalt Closure | 13 | 7-0 |
| Block Counting | 7 | 5-0 |

## Learning

| Subtests | Scaled Score | Age Equivalent |
|---|---|---|
| Atlantis | 7 | 3-0 |
| Rebus | 7 | 3-4 |

3

| Atlantis Delayed | 7 | 4-10 |
|---|---|---|

**Knowledge**

| Subtests | Scaled Score | Age Equivalent |
|---|---|---|
| Expressive Vocabulary | 6 | 3-4 |
| Riddles | 9 | 4-8 |
| Verbal Knowledge | 7 | 3-10 |

**Interpretation of KABC II**

Christopher was administered the KABC II where he achieved Mental Processing Index in the average range (86) a Sequential in the average range (88). And a Simultaneous Index in the average range (92). There was a 4 point difference between the two scores which is not significant. Christopher did not display a relative strength with either his sequential or simultaneous abilities. Christopher displayed a relative strength with visual short term memory. A relative weakness was noted with his ability to retain increasing amount of information and verbally recall information.

On the Simultaneous Index Christopher earned a score in the average range (92). He displayed a relative weakness with being able to identify the appropriate stimuli that did not belong with other stimuli on Conceptual Thinking. Another area of weakness was noted with his executive functioning skills on Block Counting. A relative strength was noted on Gestalt which assess ones visual perceptual skills.

Christopher achieved a score in the below average range (84) on Learning which assess one's long term storage and retrieval skills. Christopher was presented and taught items where he had to use knowledge learned. When taught nonsense names for colorful sea life and required to demonstrate learning by pointing to sea life named he achieved scores in the borderline range on all of these subtests.

On the Knowledge portion of the K-ABC II Christopher achieved a score in the low average range (82). When presented with items and required to name them he achieved a score in the borderline range on Expressive Vocabulary. Christopher was able to identify many of the items presented to him

4

appropriately. However he displayed difficulties with such items as a window he called it a library, a microphone he called a singer. A relative strength was noted with using his language skills to identify items presented to him.

### Summary of K-TEA II

| | | | |
|---|---|---|---|
| Letter & Word Recognition | 88 | 21 | 4-10 |
| Math Concepts & Applications | 79 | 8 | 4-6 |
| Math Computation | 83 | 13 | 4-8 |

### Interpretation of K-TEA II

When presented with upper and lowercase letters Christopher earned a score in the average range (88). Christopher was able to appropriately identify letters presented to him. Difficulties were noted with identifying beginning sounds and ending sounds. When presented with math concepts Christopher was able to identify numbers presented to him, count items presented to him and identify shapes. Difficulties were noted with identifying ordinal positions, solving simple word problems and identifying numbers over ten. When required to write numbers, sequence numbers Christopher displayed difficulties.

### Summary

Christopher was administered the K-ABC II where he earned a Mental Processing Index in the average range (86). Sequential in the average range (88), Simultaneous in the average range (92), Knowledge in the below average range (84) and Learning in the below average range (84). Academically he was administered the K-TEA II where he earned a Mathematic Concepts and Application in the average range (88), Mathematical Computation in the below average range (83) and Letter & Word Recognition in the average range (88). He is not in need of any services at this time.

Kirsten Myers Denning, MS, CAGS
School Psychologist

Children First

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | Roxanne D. Neloms |
| Miguel A. Hull | Washington, DC 20005 | Christie Fontaine-Covington |
| Christopher L. West | Telephone: (202) 742-2000 | Jani Tillery |
| John A. Straus | Facsimile: (202) 742-2098 | Kimberly Glassman |
| Omar Karram | e-mail: Admin@Jeblaw.biz | |

------------------------------------

-------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

May 24, 2007

**Via Facsimile**
Joyce Thompson, Principal
Drew Elementary School
5600 Eads Street, NE
Washington, DC 20019

**Re: Request MDT Meeting for Christopher Conrad, DOB: 4-28-00**

Dear Ms. Thompson:

This letter is to request that an MDT meeting be scheduled as soon as possible on behalf of my client Ms. Princess Watson, parent of the above mentioned student. This meeting is needed to determine eligibility for special education services. Attached is a copy of the Comprehensive Occupational Therapy Evaluation and Psychoeducational Evaluation Accordingly, please send us three dates in writing as to when your team can meet. I will review those dates with the parent and let you know when we would like to have the meeting. Thank you for your attention. Any documents pertaining to this student may be faxed to (202) 742-2098 or (202) 742-2097.

If you have any question please contact me at (202) 742-2015. Thank you for your attention and cooperation in scheduling this meeting.

Sincerely,

Miguel Hull, Esq.

Cc: DCPS Office of the General Counsel
    Marla Oaks, DCPS Office of Special Education
    Ms. Princess Watson, Parent

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO            0887
RECIPIENT ADDRESS   97244924
DESTINATION ID
ST. TIME            05/25 14:00
TIME USE            02'43
PAGES SENT          15
RESULT              OK
```

*Spoke w/ Ms. Clark @*

# JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez! + |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | Roxanne D. Neloms |
| Miguel A. Hull | Washington, DC 20005 | Christie Fontaine-Covington |
| Christopher L. West | Telephone: (202) 742-2000 | Jani Tillery |
| John A. Straus | Facsimile: (202) 742-2098 | Kimberly Glassman |
| Omar Karram | e-mail: Admin@Jeblaw.biz | |

----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:      May 25, 2007

TO:        Joyce Thompson, Principal
           Drew Elementary School

PHONE:     (202) 724-4922

FAX NO:    (202) 724-4924

FROM:      Heidi Romero, Legal Assistant for Miguel Hull, Esq.

SUBJECT:   Request MDT Meeting for Christopher Conrad, DOB: 4-28-00


NUMBER OF PAGES INCLUDING COVER SHEET: **15**


COMMENTS: **Attachments: Comprehensive Occupational Therapy Evaluation and
Psychoeducational Evaluation**

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO            0826
RECIPIENT ADDRESS   94425098
DESTINATION ID
ST. TIME            05/24 14:59
TIME USE            04'18
PAGES SENT          15
RESULT              OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Omar Karram

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Christie Fontaine-Covington
Jani Tillery
Kimberly Glassman

--------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:       May 24, 2007

TO:         Office of General Counsel
            District of Columbia Public Schools

FROM:       Heidi Romero, Legal Assistant for Miguel Hull, Esq.

FAX NO:     (202) 442-5098/5097

SUBJECT:    Request MDT Meeting for Christopher Conrad. DOB: 4-28-00

## NUMBER OF PAGES INCLUDING COVER SHEET: 15

COMMENTS: **Attachments: Comprehensive Occupational Therapy Evaluation and Psychoeducational Evaluation**

```
**********************
***   TX REPORT   ***
**********************


TRANSMISSION OK

TX/RX NO            0825
RECIPIENT ADDRESS   94425518
DESTINATION ID
ST. TIME            05/24 14:48
TIME USE            05'38
PAGES SENT           15
RESULT              OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Omar Karram
-------------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Christie Fontaine-Covington
Jani Tillery
Kimberly Glassman

-------------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:      May 24, 2007

TO:        Marla Oaks, Executive Director-Chief of Special Education Reform
           Office of Special Education

FROM:      Heidi Romero, Legal Assistant for Miguel Hull, Esq.

FAX NO:    (202) 442-5518/5517

SUBJECT:   Request MDT Meeting for Christopher Conrad, DOB: 4-28-00

NUMBER OF PAGES INCLUDING COVER SHEET: **15**

COMMENTS: **Attachments: Comprehensive Occupational Therapy Evaluation and
Psychoeducational Evaluation**

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO            0824
RECIPIENT ADDRESS   96453215
DESTINATION ID
ST. TIME            05/24 14:35
TIME USE            06'56
PAGES SENT          15
RESULT              OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Omar Karram
------------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Christie Fontaine-Covington
Jani Tillery
Kimberly Glassman

------------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:       May 24, 2007

TO:         Joyce Thompson, Principal
            Drew Elementary School

PHONE:      (202) 645-3220

FAX NO:     (202) 645-3215

FROM:       Heidi Romero, Legal Assistant for Miguel Hull, Esq.

SUBJECT:    Request MDT Meeting for Christopher Conrad, DOB: 4-28-00

NUMBER OF PAGES INCLUDING COVER SHEET: **15**

COMMENTS: **Attachments: Comprehensive Occupational Therapy Evaluation and Psychoeducational Evaluation**

# Exhibit 7

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM (MDT)

**Eligibility Meeting Notes**

MDT

MEETING DATE: 6 25 06

STUDENT: Christopher        Conrad          SCHOOL: Drew Elementary

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| parent: Pincess Watson | Chri Wato | Parent/Guardian |
| na Shawnell Gladden | Shawnell Gladden | Special Ed |
| na | | General Ed Teacher |
| Denise O. Keeling | Denise O. Keeling LSW, CW | LEA Representative |
| Kyle Bacon | | Principal or Designee |
| | | Student |
| Lesley Nesmith, MA, OTR/L | Holly Nesmith, MA, OTR/L | Occupational Therapist |
| Shron S. Fernandez | Advocates Letter are attached | Advocate |

The purpose of this meeting is to review the independent occupational evaluation on Christopher to determine if special education services are needed. Introduction of team members was conducted. The parental procedural manual was provided to the parent.

Compensatory education and ESY was discussed with the parent.
This meeting will satisfy the HOD dated 12/23/2005.
Christopher will receive OT under 504 program. He also will be re-evaluated in the area of OT+ psychological evaluation (comprehensive). There are no speech concerns. OT goals were reviewed and discussed with parents.

THE PARENT ☒ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT Christopher        Conrad

☐ IS ELIGIBLE FOR SPECIAL EDUCATION AND RELATED SERVICES
   ☐ TEAM WILL COMPLETE IEP
   ☐ TEAM WILL SCHEDULE IEP MEETING
   ☐ ADDITIONAL ASSESSMENT WILL BE ORDERED

☒ IS NOT ELIGIBLE FOR SPECIAL EDUCATION
   ☒ STUDENT IS REFERRED BACK TO THE TAT
   ☒ ADDITIONAL ASSESSMENT WILL BE ORDERED

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

MDT

STUDENT: Christopher Conrad    SCHOOL: Drew Elementary    DATE: 6-25-07

Mr. Bleader, father, stated he has seen some improvement with Christopher's handwriting. Chris still has difficulty applying downward pressure.

Ms. Watson, mother, added that the handwriting is more closer together. His coloring is more in the lines. His handwriting is legible.

Ms. Nesmith occupational therapist, reviewed the OT by the independent OT, reviewed by James G. Brown & Associates on May 3, 2007. The reports was dated 4-4-06 and conducted by Conaboy & Associates, Inc. There appears to be some sensory issues with light touch and outside noise. Recommendations were reviewed with the parents.

Ms. Watson added that they did not get the report until recently. She had been in contact with teacher regarding Chris not completing his classwork. Chris takes Singulair and Albuterol are taken for asthma on an as needed basis.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

MDT

STUDENT: Christopher Conrad          SCHOOL: Drew Elementary          DATE: 6-25-07

Ms. Lancaster, PT reviewed her screening to determine if he needed an assessment. He was able to run, walk & run. Chris did well on the playground and cafeteria. The referral stated that Chris had difficulty with fine motor skills. They had no difficulty with gross motor as Chris was functional and safe. Parents stated that Chris will sometimes fall out of the chair. Chris did not qualify for PT.

Ms. Watson & Mr. Gladder requested the "Behavior Bucks" continue this school year. Chris's educators will be informed. Ms. Watson added that Chris academics have not improved. DCPS will provide parents with copy of report card. Parents & advocate requested additional testing. Parent is concerned about Chris emotional stability, as he has been diagnosed with ADHD and Oppositional Defiant Disorder. No recommends were provided to address ODD.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MDT

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES (continuation)**

STUDENT: _Christopher  Conrad_     SCHOOL: _Drew Elementary_     DATE: 6-25-07

parent will seek to enroll Christopher in summer school as he may be retained. Advocate & parents want OT services to be funded by DCPS if OT does not begin within 30 days. DCPS did not agree to pay for independent OT if services do not begin within 30 days.

Page 1 of 2

6/25/06

( Advocate's Notes )

## Christopher Conrad

The purpose of this meeting is to review recently completed evaluations, OT and P/T, discuss further evaluations, such as, but not limited to Clinical Evaluation to obtain ~~obtain a~~ a DSM IV Diagnosis, new Psycho-Educational and speech & Language within a reasonable time.

HOD dated 12/23/05 ordered DCPS to complete a P/T and O/T Evaluations within 15 school days, if not completed then award independent P/T and O/T.

Parents obtained an Independent O/T, but failed to secure an independent P/T, DCPS completed a P/T Screener 2 days prior to the issuance of HOD.

Parents will now secure an independent P/T Evaluation, once completed then parents will submitt copies to the school for HOD meeting to convene.

O/T evaluation was completed by Cowboy & Associates. A DCPS' Occupational Therapist was present to review their eval. for the rest of the team, the evaluation made the following recommendations, direct OT services 2x a week for 30 minutes defecit areas, assist with developing classroom accommodations to enhance overall academic and classroom programming to promote carry overs and skill developement.

It must be noted that a Regular Educational was not present in the meeting (Christopher's Teacher). Parents were told that it is the summer and Christopher's Teacher is not working during the summer.

Parents were happy last year and willing to give the school system a try, Parents also felt @ that time that

Page 2 of 2

6/25/07

(Advocate's Notes)

Christopher Conrad

Attorney and Advocate were not needed, Brown & Associates recently got retired by parent, because of Christopher's lack of academic progress, this school year. Parent have been advised that he will not pass. Parents want Summer school for him.

Team agrees Christopher will receive OT Services. Team also developed a Comp Ed Plan for missed OT services in the amount of 42 hrs. Parent is requesting this to start within 30 days if not give them the right to obtain independent Services @ DCPS cost guidelines.

Based on all of information shared by team, parents believe Christopher needs Specialized Instruction in his academics, he can not complete his work, gets frustrated, and becomes easily discourage whenever that happens. Parent are worried about his self-Steem. They (Parents) would also like an OT reevaluation to be completed.

DCPS has agreed to complete a Psycho-Educational, OT. DCPS, however refuses to Complete a Clinical Evaluation @ this time.

Juan Fernandez, Advocate

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**

## NOTICE TO PARENT OF INTENT TO EVALUATE/REEVALUATE

Date: 6-25-07

To _Princess Watson / Shavell Gladden_          Ref _Christopher Conrad_
_424 55th St. NE_                                DOB _4-28-00_
_Wash. DC 20019_                                 ID # _9204775_
Telephone: (H) _2/834-2371_                      (W) _____

Dear _Ms. Watson & Mr. Gladden_

The District of Columbia Public Schools is requesting that _Christopher Conrad_ be available for testing for the following tests, on the indicated date, at the school.

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TEST DATE ASSIGNED | ADMINISTERED |
|---|---|---|---|---|
| ☑ Psychological | TBD | | 6-25-07 | |
| ☐ Speech/Language | | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☑ Educational | TBD | | 6-25-07 | |
| ☐ Hearing Screening | | | | |
| ☑ Other OT | Other: TBD | Other: | Other: 6-25-07 | |

### LIST OF TESTS WITH DESCRIPTIONS

☐ **Bayley Scales of Infant Development-II** - an individually administered instrument that measures motor, mental and social development in infants and children from 1 month to 42 months of age.

☐ **Bender Visual Motor Gestalt Test** - measures perceptual motor skills to determine visual-motor gestalt functioning and neurological soft-signs in ages 4 to 12 years using the Koppitz Scoring System.

☐ **Children's Apperception Test** - a projective story-telling technique for personality evaluation in ages 5 to 10 years.

☐ **Clinical Evaluation of Language Functions - III** - assesses the child's language functioning including processing and production.

☐ **Conner's Parent and Teacher Rating Scales -** a paper-and-pencil instrument measuring problem behaviors of children and adolescents as reported by the child's teacher, parents, or alternate caregiver.

☐ **Developmental Test of Visual Motor Integration (VMI) -** assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format.

☐ **Expressive One Word Picture Vocabulary Test** - assesses the child's single word expressive vocabulary.

☐ **Fisher-Logemann Test of Articulation Competence** - assesses articulation proficiency with single sounds, consonant blends, and vowel production.

☐ **Goldman-Fristoe Test of Articulation** - assesses the production of consonants in simple and complex contexts.

NOTICE TO PA.   [ OF INTENT TO EVALUATE/REE   .UATE          INTENT Page 2

Student _Christopher Conrad_   DOB _4-28-00_   Age _7_   Grade _1_   ID _9204775_

☐ **Goodenough-Harris Drawing Test** - a projective drawing procedure measuring intellectual perceptual-motor maturity and personality through the use of drawings of self and a member of the opposite sex in ages 3 to 15. 11 years.

☐ **House-Tree-Person** - a projective drawing technique providing insight into personality structure, physical concerns, and social-emotional adjustment in children and adolescents.

☐ **Kaufman Assessment Battery for Children** - assesses the ability to solve problems using simultaneous and sequential metal processes in four global areas: Sequential Processing, Simultaneous Processing, Mental Processing, and Achievement.

☐ **Kaufman Test of Educational Achievement (KTEA) -** an individually administered instrument measuring achievement skills in reading decoding, mathematics applications, spelling, reading comprehension, and mathematics computation.

☐ **Kinetic Family Drawing** - a projective drawing technique measuring one's perception of her family and her role within the family.

☐ **Oral Peripheral Speech Examination** - a procedure to determine whether the examinee can appropriately use the lips, tongue, mouth, etc.

☐ **Peabody Individual Achievement Test-Revised (PIAT-R) -** an individually administered test measuring achievement in areas of general information, reading recognition, reading comprehension, spelling, written expression, and mathematics.

☐ **Peabody Picture Vocabulary Test-Revised** - individually administered, multiple choice test measuring nonverbal, receptive vocabulary.

☐ **Preschool Language Scale** - measures auditory comprehension and verbal ability skills.

☐ **Receptive One Word Picture Vocabulary Test** - assesses the child's single word receptive vocabulary.

☐ **Rorschach Psychodiagnostic Test** - a projective measure y which one's responses to inkblots reveal personality structure, ego strengths and reality testing in ages 3 and older.

☐ **Test of Language Development Primary - Revised (TOLD-P) -** measures primary language proficiency and specific strengths and weaknesses in language skills.

☐ **The Vineland Adaptive Behavior Scales** - assesses adaptive and social competency skills.

☐ **Thematic Apperception Test** - a projective story-telling technique for personality evaluation in older children and adolescents.

☐ **Wechsler Adult Intelligence Scale-III (WIAS III) -** an individually administered test designed to measure the intelligence of individuals ages 16 and over.

☐ **Wechsler Individual Achievement Test (WIAT) -** a commonly used individually administered instrument designed assess the educational achievement of children and adolescents in areas of basic reading, mathematics reasoning, spelling, reading comprehension, numerical operations, listening comprehension, oral expression, and written expression.

☑ **Wechsler Intelligence Scale for Children-III (WISC III)** - commonly employed individually administered test designed to measure the intelligence of individuals ages 6 1/2 to 16 1/2 years.

☐ **Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R)** - measures specific mental abilities and processes in ages 4 1/2 to 6 1/2 years.

☐ **Woodcock-Johnson Psycho-Educational Battery** - a diagnostic and evaluation instrument composed of twenty-seven tests divided into three major parts: tests of cognitive ability, tests of achievement, and tests of interests.

☐ **Classroom Observation** - assesses present functioning of the student within the classroom environment.

☐ **List other tests with descriptions:**

**Other factors that are relevant to be included:**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION

MULTIDISCIPLINARY TEAM (MDT)

**Prior to Action Notice**

Check Purpose:
☒ Initial Evaluation
☐ Initial Placement
☐ Reevaluation
   ☐ Change in Category Exit
   ☒ Related Service Add
   ☐ Related Service
   ☐ Change in Placement
   ☐ Annual
   ☐ Other _____

Date 06/25/2007

Student Christopher          Conrad          DOB 04/28/2000

School Drew Elementary

Current Disability Category   ND

Setting   No previous LRE / not currently in Special Education

Dear Parent/Advocate

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
☐ Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☒ Other *504 services in PT*

**A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)**

☐ Your child is not eligible for special education service(s).
☐ Your child is eligible or continues to be eligible to receive special education services as a student with _____
☒ Your child will begin receiving _____ *O T* _____ as a related service(s).
☐ Your child will no longer receive _____ as a related service(s).
☐ Your child's category of disability is being changed from _____ to _____
☐ Your child's alternative placement on continuum (next setting) is being changed,
   from _____ to _____
☐ Your child is no longer eligible and will be exited from the special education program.
☐ Other: _____

Location of Services   Drew Elementary

**Description and Explanation of agency action proposed or refused.**

The MDT determined that Christopher's needs can be met in the *general education setting, not in special education*

**Description of Other Options Considered and reasons for rejection of each option**

The MDT determined that Christopher's needs can not be met in the *special education setting*

Other relevant factors to the decision- evals

MDT Members: ☒ Principal or Designee   ☒ General Education Teacher   ☐ Psychologist
   ☒ Parent   ☒ Special Education Teacher   ☒ Other: OT
   ☐ Student   ☒ Speech and Language
   ☐ Social Worker   ☒ *LEA & Interpreter  (*may be one)

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent: _____

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the **Procedural Safeguards** for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact Ms. Denise Keeling          at (202) 724-4922          (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION
MULTIDISCIPLINARY TEAM
(MDT)

**Student** Christopher     Conrad     **DOB** 04/28/20 **Age** 7     **Grade** 01     **ID** 9204775

You have the right to challenge the recommendations by requesting Mediation or a Due Process Hearing before an impartial hearing officer. To initiate a mediation or hearing, you will need to complete a REQUEST FOR MEDIATION or DUE PROCESS HEARING form and mail it to the address listed below:

**Student Hearing Office**
D.C. Public Schools
825 North Capitol Street, N.E. 8th floor
202-442-5432

You have the right to be represented at the hearing by legal counsel.
A copy of Parent's Procedural Safeguards handbook is provided.
A list of free or low cost legal service, for which you may qualify depending on your income, is included.
If you would like an additional copy, please contact the principal.

**EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

Test/Description: Classroom Observation - assesses present functioning of the student within the classroom environment.

Date of Report: 04/21/2006

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

## Free or Low Cost Legal Services

Neighborhood Legal Services
701 4th Street, N.E.
Washington, D.C. 20001
202-682-2700 (NW)
202-682-2732 (NE)
Fax 202-682-0588

Neighborhood Legal Services
1213 Good Hope Road, S.E.
Washington, D.C. 20020
202-678-2000
Fax 202-889-3374

University Legal Services
300 I Street, N.E.
Washington, D.C. 20002
202-547-0198
Fax 202-547-2662

The Children's Law Center Inc.
1050 Connecticut Avenue, N.W.
Suite 1200 Washington Square
Washington, D.C. 20036-5317
202-467-4900
Fax 202-467-4949

National Coalition for Students
with Disabilities
10560 Main Street, Suite 417
Fairfax, VA 22030
703-267-6588
(fax) 703-267-6992

MDT Prior to Action Notice
03-30-2004

2

| Student Name | Christopher Conrad | Managing School | Drew Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9204775 | DOB 04-28-00 | Attending School Drew Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments:    Goal Number: [ ]

Area addressed by goal: _Sensory Processing_

ANNUAL GOAL: (including mastery criteria.)

Christopher will demonstrate improved sensory processing and auditory processing by achieving the following benchmarks with 80% accuracy

Provider(s): Occupational Therapist, Classroom Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Christopher will willingly participate in Sensory program c̄ 80% accuracy. | | |
| Christopher will tolerate proprioceptive input to upper and lower extremities c̄ 80% accuracy in preparation for structured tasks | | |
| Following 1-2 step directions/commands Christopher will verbally repeat directions c̄ 80% accuracy on 4/5 trials presented. | | |
| After listening to a short story Christopher will recall 1-2 details of the story c̄ minimal assistance on 4/5 opportunities | | |
| Christopher will utilize picture chart/charts etc. to perform classroom sensory based activity c̄ 80% accuracy on 4/5 trials presented. | | |
| Christopher will utilize an adaptive seating device (ie. disc 'o sit) to elicit an upright posture during classroom task 20-30 min c̄ | | |

**EVALUATION PROCEDURE(S)**

Portfolio    Log    Chart    Test    Documented Observation    Report    Other _Quarterly Report_

| Student Name | Christopher Conrad | Managing School | | OCPS - IEP |
|---|---|---|---|---|
| Student ID Number | DOB 04-28-00 | Attending School | Drew Elementary | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: | Goal Number: |
|---|---|---|

Area addressed by goal: _Sensory Processing_

**ANNUAL GOAL: (including mastery criteria.)**

Christopher will demonstrate improved sensory processing and auditory processing by achieving the following benchmarks with 80% accuracy.

Provider(s): Occupational Therapist; Classroom Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Following sensory input, Christopher will successfully navigate a 4-5 part obstacle course c̄ 80% accuracy on 4/5 trials presented. | | |
| Following sensory input, Christopher will explore and transition between playground equipment during a 20-30 minute interval c̄ 80% accuracy on 4/5 trials presented. | | |
| Following sensory/proprioceptive input, Christopher will navigate classroom environment c̄ 80% accuracy | | |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

| Portfolio | Log | Chart | Test | Documented Observation | Report | Other | Quarterly Report |
|---|---|---|---|---|---|---|---|

| Student Name | Christopher Conrad | Managing School | New Elementary | DCPS - IEP |
| Student ID Number | 9204775 | DOB | 04-28-00 | Attending School | New Elementary | Page 3 of 4 |

VIII. SPECIALIZED SERVICES     Additional Comments:          Goal Number: [ ]

Area addressed by goal: Visual Motor / Visual Perception / Fine Motor

ANNUAL GOAL: (including mastery criteria.)

Christopher will demonstrate improved visual motor, visual perception and fine motor skills to enhance classroom participation, as evidence by 80% mastery of the following benchmarks.

Provider(s): Occupational Therapist; Classroom Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Christopher will willingly participate in structured therapist guided handwriting program (i.e. HWOT) to 80% accuracy | | |
| Christopher will spontaneously produce upper case and lower case letters of the alphabet while demonstrating proper letter formation, directionality, spacing and sizing to 80% accuracy on 4/5 trials presented. | | |
| Christopher will copy age appropriate geometric shapes of increasing complexity to 80% accuracy on 4/5 opportunities presented. | | |
| Christopher will complete age appropriate puzzle activity c minimal assistance on 4/5 trials presented | | |
| Christopher will complete a zig-zag maze activity c minimal assistance on 4/5 trials presented. | | |
| Christopher will demonstrate an appropriate pencil grasp while utilizing a pencil grip to 80% accuracy | | |

EVALUATION PROCEDURE(S)

Portfolio     Log     Chart     Test     Documented Observation     Report     Other Quarterly Report

# Exhibit 8

HOWARD UNIVERSITY
CHILD DEVELOPMENT CENTER
INTERPRETATION CONFERENCE SUMMARY

Christopher Watson.                          4/28/2000
_____Patient's Name_____                _____Birth Date_____

                                            4/12/05
_____Case #_____                        _____Date of Conference_____

CONFERENCE ATTENDEES:

1. Princess Watson          3. Dr. Asiedu
2. Shawnell Gladen          4. _____

CONCLUDING DIAGNOSIS:
— ADHD combined type
— Oppositional Defiant Disorder
— Graphomotor Disorder — At risk for Learning Disabilities in Written Expression
— Sleep Disorder Dysfunction.
— Hypotonia,
— Pes planus → Genu Valgum.

PSYCHOLOGICAL RESULTS:
4+ years for Expressive + Receptive Skills
as well as visual motor skills.

RECOMMENDATIONS:
— Psycho-educational evaluation to establish level of
  functioning and attention difficulties.
— Referral to Occupational Therapy to evaluate writing Skills
— Referral to Physical Therapy to evaluate flat foot + clumsyness
— Referral to Sleep Disorders Clinic to evaluate
  Snoring and Sleep dysfunction.
— Return Teacher evaluation form towards
— Consider starting on medications.

_____Parent's Name_____                 _____Physician Name_____

# Exhibit 9

1

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF PUBLIC SCHOOLS
OFFICE OF STUDENT HEARINGS

#

In the Matter of

CHRISTOPHER CONRAD

#

Washington, D.C.

October 30, 2007

The above-entitled matter came on
for hearing, pursuant to notice.

BEFORE:
    Ms. J. Dolkart, Hearing Officer


APPEARANCES:

    On Behalf of the Student/Parent:

        Miguel Hull, ESQ.

    On Behalf of D.C. Public Schools:

        Rasheeda Wilson, ESQ.




    This transcript was produced from
an audio CD provided by D.C. Public Schools.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

2

TABLE OF CONTENTS

Opening Statements                    Page
Miguel Hull, Esq.                      24
For the Student

Rasheeda Wilson, Esq.                  31
For the DCPS


Witnesses              Direct    Cross
For the Student
Juan Fernandez           34         44
Princess Watson          51         --

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C. 20005-3701         www.nealrgross.com

1                    P-R-O-C-E-E-D-I-N-G-S

2                              (12:18 p.m.)

3              HEARING   OFFICER   DOLKART:   This

4    hearing is called to order.  It is 12:18 p.m.

5    I am Hearing Officer Dolkart.  Good, I guess,

6    afternoon to all of you.

7              Sorry  for  the  long  wait  you  had,

8    but we have a limited number of human bodies

9    to defend cases for DCPS and sometimes people

10   get tied up.  We try not to do that, but it

11   happens.

12             Okay.   I  will  be  presiding  over

13   today's hearing.  Today is Tuesday, October

14   30, 2007.  It is 12:19 p.m.  The, we are in

15   Room 7A.  The hearing is being conducted at

16   Van Ness Elementary School, located at 1150

17   5th Street, SE, Washington, D.C.

18             The  matter  before  us  today  is  the

19   administrative hearing of Christopher Conrad.

20   Date  of  birth  April  28,  2000  versus  DCPS.

21   This   is   a   Special   Education   Due   Process

22   Hearing  conducted  in  accordance  with  the

1    guidelines and rights established pursuant to

2    the IDEA.

3               The    rules    of    the    Board    of

4    Education    for    the    District    of    Columbia,

5    Section 145 of the D.C. Appropriations Act and

6    Title 38 of the D.C. Code.    The hearing is

7    closed to the public and it is being recorded.

8     Either party may request a copy of the tape

9    or a written transcript after the hearing is

10    completed by writing to the Student Hearing

11    Office at this address.

12               The purpose of today's hearing is

13    to    allow    each    party    to    this    dispute    an

14    opportunity to present evidence and testimony

15    in support of their respective positions so

16    that I as a hearing officer am able to render

17    a    decision    on    the    issues    raised    by    the

18    complaint.

19               The    parties    present    for    today's

20    hearing are, Miguel Hull, attorney for the

21    student;    Princess    Watson    (phonetic),    the

22    student's mother; Juan Fernandez (phonetic),

1    the student's educational advocate; and

2    Vidalia Lopez (phonetic), also the student's

3    educational advocate; and Rasheeda Wilson,

4    attorney for DCPS.

5            The issue before us today is

6    whether DCPS has denied Christopher Conrad

7    (inaudible) by failing to implement a comp ed

8    plan developed in June of 2007. Is that

9    correct?

10            MR. HULL: Yes.

11            HEARING OFFICER DOLKART: Okay.

12    The order of the hearing will be as follows:

13    The petitioner has the burden of proof in this

14    instance. And therefore, the petitioner will

15    get to put on their case first by submitting

16    documents and presenting whatever testimony

17    they have.

18            And DCPS will have an opportunity

19    to cross-examine all witnesses. Thereafter,

20    DCPS will put on its case again through

21    whatever documents are in the record and

22    through whatever witnesses are presented and

1      petitioner will have the opportunity to cross-

2      examine those witnesses.

3                     Each   party   will   be   given   an

4      opportunity  for  a  short  closing  --  opening

5      statement.  And if I feel it is necessary, a

6      short closing statement.

7                     Have  you  apprised  your  client  of

8      her due process rights?

9                     MR.   HULL:  Yes,  she's   aware  of

10     those  rights  and  waives  formal  reading  of

11     them.

12                    HEARING   OFFICER   DOLKART:   Thank

13     you.  I am not an employee of the D.C. Public

14     Schools,  of  any  public  charter  schools,  or

15     private schools that a DCPS student has been

16     placed in.  I have no relationship or close

17     acquaintance with any of the parties involved

18     in his hearing.

19                    I will render a decision solely by

20     hearing the evidence presented and ruling in

21     accordance with applicable laws, rules, and

22     regulations.

1              Okay, are there any preliminary

2     matters before we get to the question of

3     (inaudible) evidence?

4              MR. HALL: Nothing from the parent.

5              MS. WILSON: Nothing from the

6     school system.

7              HEARING OFFICER DOLKART: Well, I

8     hate to say it, but I have one.   Is

9     Christopher covered by the IDEA?

10             MR. HALL: He's not.   He's covered

11    under Section 504 of the Rehabilitation Act.

12    And pursuant to that Act, he is entitled to

13    procedural safeguards.  And according --

14             HEARING OFFICER DOLKART: Do I have

15     jurisdiction over that?

16             MR. HALL: I think you do.  I was

17    anticipating this.   And so I have -- I have

18    some information to give you.   It is an

19    interesting point that you raised.

20             HEARING OFFICER DOLKART: Yes, and

21    I actually, I mean, I've not had this specific

22    issue arise before.  I've had 504 Plans, but

1      they've been --

2                  MR. HULL: Right.

3                  HEARING    OFFICER    DOLKART:     --

4      combined with issues that have to do with --

5                  MR.    HULL:    Right.     And    I've

6      actually never had a (inaudible) before issue

7      either.

8                  HEARING  OFFICER  DOLKART: Yes,  and

9      I asked a few of my colleagues who are not

10     necessarily experts on the subject and have

11     not necessarily researched it themselves, but

12     they're not clear that I do have jurisdiction.

13                 MR. HULL: Well, I can tell you --

14     here's what I have.  Section -- the procedural

15     safeguards of Section 504 set out in 34CFR

16     104.36.  If you look at them though you'll see

17     that they're more of a summary.  They don't

18     really specify what's -- what is to happen to

19     protect the student -- a student's procedural

20     safeguards.

21                 However, it says, "Compliance with

22     the    IDEA's    procedural    requirements    is

1    identified as one means of meeting Section 504

2    requirements."   It says, "Unless the school

3    district has opted out of that scheme and

4    developed a whole separate set of regulations

5    for compliance with 504 procedural."

6              So in the absence of a separate

7    scheme then compliance through -- through IDEA

8    procedures satisfies 504.  My argument to you

9    is that in the District of Columbia there is

10   no separate regulatory scheme for having

11   hearings for 504 violations.

12             Therefore, the fallback that's

13   contemplated by the regulation is IDEA.  And

14   so that's where we are.  But also point out

15   that DCPS, the opposing counsel has made no --

16   no prior motion, so they don't -- I don't

17   think they even --

18             HEARING OFFICER DOLKART: I realize

19   that, but this is a jurisdiction issue --

20             MR. HULL: No, I know you -- I

21   understand.  I understand --

22             HEARING OFFICER DOLKART: -- and I

10

1  don't care what --

2              MR. HULL: I understand, but --

3              MS. WILSON: Right.  And can I just

4  note that this is a coverage.  I'm covering

5  for another attorney on this particular case.

6              HEARING  OFFICER  DOLKART:  Right,

7  but he didn't --

8              MR. HULL: He didn't do it either.

9              HEARING OFFICER DOLKART: He didn't

10  say anything either.

11              MS. WILSON: Okay.

12              MR.  HULL: And  so  it  would  --  it

13  would be slightly different if they had come

14  to you weeks ago with a motion and authority,

15  but --

16              HEARING   OFFICER   DOLKART:    It

17  wouldn't change  the jurisdiction issue.   It

18  might -- might have --

19              MR.  HULL: Well,  it  might  tip  it

20  more against me is what I'm saying.

21              HEARING OFFICER DOLKART: I  might

22  have done the research to find the answer.  I

1    get your argument.

2              MR. HULL: Okay.

3              HEARING OFFICER DOLKART: And I'm

4    certainly not prepared to reject it --

5              MR. HULL: Okay.

6              HEARING OFFICER DOLKART:   -- at

7    this time.  Although, I'm also not prepared, I

8    mean, to absolutely accept it because I have

9    to determine independently --

10             MR. HULL: Of course.

11             HEARING  OFFICER  DOLKART:   --

12   whether I have jurisdiction over this matter.

13    But it isn't so clear that I don't that, you

14   know, I won't go forward.

15             MS. WILSON: Okay.  I just wanted

16   to note that DCPS does have a policy in terms

17   of viable for -- I don't have it with me.  I

18   can provide it to you, a 504 implementation

19   and procedure safeguards 4504, so we certainly

20   do have that.

21             And I, again, I just want to note

22   though in terms of the -- I don't have it with

1   me.  And I accept both counsel and the hearing

2   officer's representation that the assigned

3   attorney did not file a motion, but I don't --

4   I can get it.  I mean, I can get it here.

5              HEARING OFFICER DOLKART: I don't

6   see any evidence that there was a response to

7   this complaint or that there was a resolution

8   session.  Although, I'm not certain about

9   that.

10             MR. HULL: I don't think there was.

11    There was none.

12             HEARING OFFICER DOLKART: I don't -

13   - I don't see anything that suggests there --

14   there was either.

15             MS. WILSON: Well, in terms of a

16   resolution session, I mean, that certainly

17   from my limited understanding, and I certainly

18   do have a witness that can go into this

19   further, is that there were attempts to

20   schedule a resolution session, but that was

21   given the parents --

22             HEARING OFFICER DOLKART: Oh, I'm

1    so sorry.  Go on.

2              MS.  WILSON:  Given  the  parents

3    preference was delayed a bit or rescheduled or

4    -- I don't want to speak for the witness on

5    that.  But the witness is certainly able to

6    testify as to the resolution session.

7              HEARING  OFFICER  DOLKART:  Right.

8    I'm  not  suggesting  I'm  dismissing  this

9    complaint  because  of  a  lack  of  resolution

10   session.  I'm -- I'm just saying if the

11   opportunities  whereby  this  issue  might  have

12   arisen sooner, did not appear to have taken

13   place, and so here we are.  So, all right.

14             So we're going to forward with the

15   hearing and I'm going to ask each of you to

16   provide  me  with  a  written  submission,

17   including  whatever  statutory  provisions  you

18   are -- so, whatever regulations you're relying

19   on or any case log that you're relying on.

20             And  I  would  like  that  by  the  end

21   of  the  week,  please.  So  Friday  by  5:00

22   because there's no point in my doing anything

14

1    on  this  case  until  that  issue  is  resolved.

2    You may email it to me --

3              MR.  HULL:  Can  I  get  your  email?   I

4    don't think I --

5              HEARING  OFFICER  DOLKART:  Yes.   At

6    Dolkartj@gmail.com.      Okay,    any    other

7    preliminary matters besides the evidence?

8              MR.  HULL: None from the parent.

9              MS.  WILSON: None.

10             HEARING  OFFICER  DOLKART:  Okay.   So

11   then  let's  turn  to  the  admission  of  the

12   documents.    I   have   before   me   a   five-day

13   disclosure   letter   from   petitioner   dated

14   October 23, 2007, consisting of a witness list

15   and attached documents CC-1 through CC-14.

16             Does DCPS have any objections?

17             MS.  WILSON: No objection.

18             HEARING    OFFICER    DOLKART:    Okay.

19   And   I   also   have   before   me   a   five-day

20   disclosure  from  DCPS  dated  October  23,  2007,

21   consisting  of  a  witness  list.   There  are  no

22   documents attached.

1              Mr.   Hull,   do   you   have   any

2    objections to the witness list?

3              MR. HULL: Your indulgence for just

4    a  moment,  please,  regarding  that.   I  do

5    actually.  And I'd like to point that this was

6    a continued hearing.  And it would have been

7    continued by Mr. Fraser (phonetic).   It was

8    originally set for August 29.

9              And you'll note that in the file

10   you should have an exhibit packet dated August

11   27 from our side on this case, which August

12   22, which is identical.  It contains the same

13   documents as October 23.

14             HEARING  OFFICER  DOLKART:  Well,

15   it's  a  good  thing  it  contains  the  same

16   documents because I don't have any -- I don't

17   --

18             MR.  HULL:  Here's  --  here's  the

19   original.  And then we resubmitted it with a

20   new date.

21             HEARING  OFFICER  DOLKART:  I  don't

22   think we need to -- yes, I believe you.   I

1  mean --

2          MR.  HULL:  Okay.   Now,  what  I  was

3  going  to  get  into  was  that  DCPS  also

4  submitted,  there's  two  disclosures  on  this

5  one.   Now,  I take issue with the October 23 as

6  being grossly untimely.  And I -- I would seek

7  to  exclude  some  of  the  witnesses  that  are

8  listed.

9          If  you  look,  when  I  received  the

10 October 23 disclosure for today, it was 11:40

11 p.m.  on  the  night  of  the  23rd.    Hardly,

12 hardly,  within  the  five  days  that  are

13 contemplated by the statute and regulation.

14         HEARING  OFFICER  DOLKART:  Tell  me

15 again when you got it.

16         MR.  HULL:  October  23.   Now,  there

17 is  a  prior  disclosure,  September  6,  which

18 would  suffice,  but  to  the  extent  that  there

19 are  any  witnesses  or  evidence  disclosed  in

20 this  that  were  not  previously  disclosed,  I

21 would object because I think that's untimely.

22         MS.  WILSON:  Okay.   And  here's  the

1    problem with that.    The complaint for the

2    first date was July 2, 2007, for -- scheduled

3    for August 29.    There's actually no way that

4    this, that a complaint filed on August 28,

5    which is the date of this current complaint,

6    could have been scheduled for a hearing on

7    August 29.

8              So    we've    got    two    separate

9    complaints here.    So to say that the prior

10   disclosure, whatever that prior disclosure,

11   that was for the complaint that was filed July

12   2.

13             We're    here    today    based    on    the

14   complaint filed August 29 -- 28, excuse me.

15   So on that basis alone the two, the different

16   disclosures, I think one has nothing to do

17   with the other because they are based on two

18   different complaints.

19             And    secondly,    I    would    just    note

20   that it is certainly normal practice within

21   this jurisdiction to send disclosures, to have

22   received disclosures from -- disclosures from

18

1    parents' counsel and to send disclosures from

2    DCPS  certainly  well  after  5:00  p.m.  in

3    business hours.

4              There  has  been  nothing  filed  prior

5    to  this  witness  list.    So  there's  been,  I

6    mean,  where's  the  harm?    Where's  the

7    prejudice?

8              Certainly,  as  of,  even  if  counsel

9    didn't  receive  the  disclosure  until  October

10   24,  there  has  been  nothing  that  we  have  in  the

11   record  demonstrating  some  type  of  an

12   establishment  of  harm  or  prejudice  to

13   petitioner  nor  any  filing  to  the  hearing

14   officer  to  restrict  any  witnesses  based  upon

15   the  time,  the  time  of  it.

16             HEARING  OFFICER  DOLKART:  Now,  when

17   did  --  tell  me  again  when  you  said  you

18   received  it?

19             MR.  HULL:  If  you  look  at  the  fax,

20   11:40  p.m.

21             HEARING  OFFICER  DOLKART:  All

22   right.    It  was  --  it  was  received  --  it  was

1    received on October 23.  I'm not even going to

2    go into whether we need to waive anything.

3                 I don't think the rule has -- has

4    any time in it as to when -- as to when a

5    disclosure must be received.  And I don't

6    think that you suffered any prejudice if you

7    didn't get it till the next day as Ms. Wilson

8    has suggested.

9                 MR. HULL: May I be heard though?

10                 HEARING   OFFICER   DOLKART:   It   is

11   nothing but a witness list, so I'm going to

12   admit it.

13                 MR. HULL: May I be heard though?

14                 HEARING OFFICER DOLKART: Sure.

15                 MR.  HULL:  Just  very  briefly  and

16   with all due respect to you.  I believe the

17   rule says five business days.  So 11:40 hardly

18   comes within the business day.

19                 Also,  if  you  look  at  the  D.C.

20   Municipal Regulations, this is one of those

21   interesting  situations  where  the  regulation

22   actually  doesn't  give  the  authority  to  the

1    hearing officer.

2                  The regulation says in Title 5,

3    3000, I think 19. I'll have to get it for you

4    though.    It says, "Any party can exclude

5    evidence that is not disclosed within the time

6    limit."    Not the hearing officer, but the

7    actual party.

8                  So this is a rare instance where

9    actually the parent has the authority to

10   exclude it, not -- not the hearing officer.  I

11   would submit that your role is to -- to

12   enforce -- enforce that rule, but not -- not

13   to determine whether -- whether something can

14   be submitted.

15                  There is an exception though where

16   the hearing officer can let in evaluations.

17   And that's also in those same regulations.

18   But here I'm seeking to, the parent is seeking

19   to exclude the witness list.    And the

20   witnesses listed thereon.

21                  MS. WILSON: And I'll just note

22   that, I mean, certainly the federal regs also

1    allude to a party being able to prohibit

2    information not disclosed five days before.

3    We submit that this information, that this

4    witness list, again, was disclosed five days

5    before.    There's nothing in IDEA that says

6    that it has to be disclosed by 5:00 p.m.

7         So, and counsel has yet to address

8    the fact that the two disclosures are for two

9    separate complaints.    So any prohibition of

10   the first complaint that is in the record,

11   which first, excuse me, the first DCPS

12   disclosure, which is based on a July 2

13   complaint, would have no bearing on

14   disclosures for an August 28 -- 28 complaint.

15        So with that being said, and given

16   the fact that in our view the document was

17   disclosed five days prior to, again, there's

18   no -- there's been no proffer as to what harm

19   petitioner has suffered as a result of the

20   disclosures coming in after 5:00.

21        Again, it's a witness list.

22   Petitioner is well aware of -- of the -- the

1    various  entities,  including  DCPS  central

2    office, along with Drew (phonetic) Elementary

3    School  and  Park  View  (phonetic)  Elementary

4    School.

5                HEARING  OFFICER  DOLKART:  I'm  just

6    going to cut you off right here.

7                MS. WILSON: Okay.

8                HEARING   OFFICER   DOLKART:   Because

9    this was disclosed within five business days.

10    I mean if you count days, —it—was disclosed

11    within  five  business  days.   And  there  is

12    nothing that says it has to be by a particular

13    time limit.

14                I'm   going   to   introduce   it,

15    although, I must say if I see one more of Mr.

16    McCall's  list,  every  witness  who  could

17    possibly,  everyone  employed  in  DCPS  as  a

18    witness, whether it's relevant or not, I may

19    be inclined to do otherwise.

20                I  understand,  Ms.  Wilson,  you're

21    not  responsible  for  this  disclosure.   It's

22    less  than  helpful,  shall  we  say,  to  anybody,

1    including Mr. McCall.

2              Okay, so are we ready then --

3              MR. HULL: Sure.

4              HEARING OFFICER DOLKART:  -- for a

5    brief -- this is a -- this is a simple issue,

6    so -- well, actually I do want to ask one

7    other thing.  I've looked at this.  And it

8    seems as though there are other issues besides

9    the simple one that you have put into this

10   complaint.

11             I've already now have determined

12   that there is at least one other complaint

13   that was filed on July 2.  Are there -- are

14   there yet more?

15             MR. HULL: No, we're expected to

16   have a meeting next week, so I can't

17   anticipate what will happen.  The student

18   changed schools.  So the fact that his

19   environment changed, it sort of changed his

20   needs and his -- his acting out sort of --

21   sort to speak.

22             HEARING OFFICER DOLKART:  The

1    beginning of this year.

2             MR. HULL: Yes.

3             MS. WILSON: But that's not the

4    purpose of the meeting.

5             MR. HULL: But that's not really

6    relevant.  That's not really relevant to this

7    hearing.

8             HEARING  OFFICER  DOLKART:   I

9    understand.  Okay.  I, you know, I know -- I

10   know you do this.  I understand why you do it,

11   but I hate that you take one, a series of

12   events in a student's life, and instead of

13   getting them all resolved at once to the

14   benefit of the student, you -- you file a

15   number of separate complaints.

16            I understand why it's done, but I

17   don't think ultimately it serves the best

18   interest of anyone.  So I just wanted to see

19   what else was out there.

20            All right.  Mr. Hull, opening.

21        OPENING STATEMENT BY MIGUEL HULL, ESQ.

22            ON BEHALF OF THE PARENTS

1           On June 25, 2007, the parents and

2     their educational advocate, appeared at Drew

3     Elementary for an MDT (phonetic) meeting to

4     review an occupational therapy and physical

5     therapy assessment that had been previously

6     done for Christopher.

7           During that meeting, the team

8     determined that Christopher had not been

9     provided with all of the occupational therapy

10    called for by his plan and that this omission

11    had resulted in harm.  The team then developed

12    a compensatory education plan for Christopher

13    to receive 42 hours of OT.

14          The team determined that it would

15    begin within 30 days from the meeting.  As of

16    the date of the filing the complaint, 30 days

17    had past and it had not begun.

18          I can also tell you that we intend

19    to show that to date, as far as we are aware,

20    the parent and the two advocates, it has not

21    begun.  Now, Christopher is receiving services

22    pursuant to a 504 Plan.

1          You   may   note   that   we   didn't

2    specifically disclose an actual 504 Plan.  And

3    I've  been  wondering  about  that.   But  the

4    regulations  that  apply  to  504  allow,  state

5    that  a 504 Plan does not have to be actually

6    written down.  And that can be found at 34 CFR

7    104.31 through 39.

8          In this case, evidence of the 504

9    Plan can be found at Exhibit Number 7, where

10   the team, DCPS members of the team on June 25,

11   actually  wrote.   And if you'll notice,  the

12   first page on -- not to add to the confusion

13   here, Exhibit Number 7, this first page upper

14   right it says, `06.  That has to be an error

15   and it is an error because if you look at the

16   next page, it's `07.

17          HEARING  OFFICER  DOLKART: As is the

18   page after.

19          MS.  WILSON:  Right,  and  we'll

20   stipulate that.   I mean, that's -- that's

21   fine.

22          MR.  HULL: Yes, I, just to clear

1    that up.   But there they do -- they do say

2    that he's getting, he's supposed to receive

3    services under a 504 program.  So even though

4    we don't have an actual 504 program to show

5    you,  I'd  submit  that  the  regulations

6    contemplate that, and that this is evidence

7    that there is a 504 Plan for him.

8                As   far   as   the   compensatory

9    education, if you look, there's two sets of

10   notes here.  One on the official team notes

11   that DCPS drafted.  And then right adjacent to

12   that are Mr. Fernandez' notes that he took

13   contemporaneous to this meeting.

14               In  Mr.  Fernandez'  notes  --  well,

15   both the parent and Mr. Fernandez were present

16   at the meeting.  Both of them will testify and

17   his  notes  support  that  the  team  agreed  to

18   provide the 42 hours to begin within 30 days.

19               It's  not  quite  as  clear  in  the

20   official  team  notes.   I  will  concede  that.

21   They  --  they  mention  on  the  last  page  that

22   advocate  and  parent  want  OT  services  to  be

1    funded by DCPS if OPT does not begin within 30

2    days.

3                 DCPS does not agree to provide for

4    -- pay for independent OT if services to not

5    begin within 30 days.  But I think I would ask

6    that   you   listen   to   and   give   careful

7    consideration  to  the  parent's  testimony  and

8    Mr. Fernandez' testimony.  They were at the

9    meeting and they recall the discussions that

10   took place.

11                Also, Mr. Fernandez' notes were

12   contemporaneous  were  in  fact  done  as  the

13   meeting  was  going  forward.   And  his  notes

14   reflect  that  the  team  agreed  to  do  the  42

15   hours.

16                To date, as far as we know, those

17   42  hours  have  not  begun.   The  student

18   transferred from Drew to Park View and began

19   at Park View at the beginning of the school

20   year.

21                The  parent  does  not  believe  that

22   any hours are being provided, not the regular

1    OT, which would be part of the 504, nor this

2    comp ed OT.  We've got two different OTs.

3                HEARING OFFICER DOLKART:  You mean

4    from the time of the meeting to the present

5    the OT that should have been being provided

6    for the 504 Plan has not at all been provided.

7                MR. HULL:  Correct.  Now, he was

8    out of school during the summer, so that

9    doesn't count.  But ever since he's been at

10   Park View, he should have been getting it.

11   Now, we didn't raise that issue on the regular

12   504 OT because we weren't clear on it.

13               And we do have a meeting that

14   we're trying, that isn't formally scheduled

15   yet, but there have been some back-and-forth

16   to set it up.  Hopefully, in the next couple

17   of weeks we can investigate that further.

18               The issue here are the 42 hours of

19   comp OT.  As far as the parent knows based on

20   her discussions with her -- her child, her

21   discussions with the school that he's at now,

22   the 42 hours have not been provided.  Nobody

30

1 | has notified her.

2 | Nobody contacted her over the
3 | summer. Her contact information changed
4 | towards the end of the summer, but she right
5 | away notified DCPS. And so that's what we
6 | have to go on. And we have no documents to
7 | support any assertion that DCPS may have that
8 | they have in fact begun to provide the 42
9 | hours of OT.

10 | So what we would ask for at this
11 | point is relief would be 42 hours of
12 | independent OT. Independent, the parent will
13 | probably testify to you that she wants
14 | independent because they've had plenty of time
15 | to get this started.

16 | I'd also note that we have been
17 | somewhat hampered by DCPS choosing not to file
18 | a written response. Now, we didn't file a
19 | formal motion on that, but I want to point
20 | that out as far as any credibility issues that
21 | come into play or any ambiguities that you may
22 | see.

1       I think all those should sort of fall

2    against DCPS in light of the fact they chose

3    not to -- not to have -- provide us with a

4    written response to this complaint. Thank

5    you.

6             HEARING OFFICER DOLKART: Thank

7    you. I am more than aware of the fact that

8    the regulations provide that I can take into

9    account the fact that a response was not

10    filed.

11             Ms. Wilson.

12             MS. WILSON: Sure.

13    OPENING STATEMENT BY RASHEEDA WILSON, ESQ.

14      ON BEHALF OF D.C. PUBLIC SCHOOLS

15          I just want to note that DCPS is

16    not disputing that the -- that the team, the

17    MDT team, at the end of the school year, end

18    of the `06/'07 school year at Drew Elementary

19    determined that petitioner was entitled to 42

20    hours of special education.

21          It is our position, and you will

22    hear testimony today, that those hours of

1    occupational therapy have already begun at the

2    new school, which is Park View Elementary

3    School.    We would disagree with counsel's

4    assertion that the notes indicating that

5    petitioner will receive services pursuant to a

6    504 Plan is the plan itself.

7                    Contrary to what the -- what

8    regulation petitioner read saying that it does

9    not have to be a written plan, DCPS, and --

10   even though it's not at issue, you can hear

11   testimony as to the schools -- and counsel as

12   already alluded to the fact that a meeting is

13   set to take place, not next week, but the week

14   after next.

15                   And the purpose of that meeting is

16   to continue to flush out those 504 Plan issues

17   and to continue to create the plan.  So it is

18   our assertion that the services that

19   petitioner is currently getting for

20   occupational therapy are the compensatory

21   education services that petitioner is entitled

22   to.

1          We're    not    at    all    disputing

2     petitioner's  entitlement  to  those  services.

3     And  because  it  is  our  position  that  the

4     services have already begun, petitioner is not

5     entitled to get those independently.

6              HEARING   OFFICER   DOLKART:   Okay.

7     Let me ask one other question.  I've read that

8     some  place  in  here,  DCPS  said  that  it  was

9     going  to  do  some  evaluations.  Is  that,  or  am

10    I thinking of another case?

11              MR. HULL: Your indulgence.

12              HEARING  OFFICER  DOLKART:  I  may  be

13    thinking  of  another  case.  I'm  sorry.  I  think

14    I  am.  Okay.  Who  would  you  like  to  put  on

15    your first witness?

16              MR. HULL: Mr. Juan Fernandez.

17              HEARING   OFFICER   DOLKART:   Okay.

18    Mr.  Fernandez,  would  you  please  raise  your

19    right hand?

20    WHEREUPON,

21              JUAN  J.  FERNANDEZ

22    was  called  as  a  witness  by  Mr.  Miguel  Hull,

1    and was examined and testified as follows:

2                      DIRECT EXAMINATION

3              BY MR. HULL:

4        Q    Now, that you're under oath, state

5    your name for the record, please?

6        A    Sure,   my   name   is   Juan   J.

7    Fernandez.

8        Q    Where is your current employment?

9        A    Currently  employed  by  Brown  and

10   Associates (phonetic).

11       Q    In what position?

12       A    I'm an educational advocate.

13       Q    How   long   have   you   held   that

14   position?

15       A    Close to six years now.

16       Q    What   are   your   duties   as   an

17   educational advocate?

18       A    Well,   I'm   involved   with   the

19   parents and going to, attending meetings, BSEP

20   (phonetic)   meeting,   MDT/IEP   (phonetic)

21   meeting, 504 meetings.

22       Q    What do you do at those meetings?

1          A    Usually,  I'm  the  voice  of  the

2     parents.  I'm the right hand of the parents.

3     I speak  on  the  parent's  behalf  if  they  so

4     choose.

5          Q    Okay.  And do you have any formal

6     training from your employer for that position?

7          A    I   was   actually   not   formally

8     trained.  Informal training twice a month by a

9     former  colleague  of  mine,  who  was  a  hearing

10     officer.   Her name  is  Dr.  Robin  Boucher

11     (phonetic), gave us informal training twice a

12     month, (inaudible) kind of lunch thing --

13          Q    Okay.

14          A    -- about special ed.  Not just to

15     me, but to the other advocates as well.

16          Q    And   are   you   familiar   with

17     Christopher Conrad?

18          A    I am.

19          Q    How are you familiar with him?

20          A    I actually attended a meeting for

21     him over the summer.

22          Q    Was  that  a  meeting  on  June  25,

1    2007?

2         A    Yes, it was.

3         Q    And what was the purpose of that

4    meeting, if you remember?

5         A    Yes, I do.    It was actually to

6    review OT evaluation that had been recently

7    completed.    It was an independent OT

8    evaluation.

9         Q    Okay.    I'm going to show you

10   Exhibit Number 2.    Is that the evaluation

11   you're talking about, parent's Exhibit Number

12   2?

13        A    Conrad -- yes, it is.

14        Q    Okay.    And during that meeting,

15   did the team talk about any compensatory

16   education for the student?

17        A    We did.

18             MS. WILSON: I have an objection.

19   Just only as to, in terms of clarification, in

20   terms of the testimony.    DCPS has already

21   acknowledged just perhaps in terms of time.

22   And we've acknowledged the comp ed.    And maybe

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C. 20005-3701         www.nealrgross.com

37

1    we want to deal with whether or not --

2              MR. HULL: I understand.

3              HEARING   OFFICER   DOLKART:   All

4    right.  You've acknowledged that DCPS agreed

5    to provide 42 hours of comp ed.

6              MS. WILSON: Correct.

7              HEARING OFFICER DOLKART: Okay.

8              MS.   WILSON:   And   that's   in   the

9    record.

10             MR. DULL: Okay.

11             MS.   WILSON:   I   mean   that's   not

12    something --

13             HEARING   OFFICER   DOLKART:   Yes,

14    let's move on from there.

15             MR. HULL: I can do that.

16             HEARING   OFFICER   DOLKART:   So   the

17    question is, has it been implemented?  And, if

18    not, do you -- do you get to have it done

19    independently at DCPS's expense?   Is   that

20    correct?

21             MS. WILSON: Correct.

22             MR.  HULL:  I  think  so.   Just  one

1    point of clarification.  Are they conceding

2    then that it was to begin within 30 days or

3    not?

4              MS. WILSON: Well, given the fact

5    that the note, I mean, no, because that's

6    contrary to what is documented in the notes.

7    And I would think given the fact that it was

8    over the summer.  But that's another issue.

9    So, but I'm --

10              MR. HULL: Okay.  ~~Well,~~ then I can

11    question my witness about that as far as when

12    it was to begin.  It's already a foregone

13    conclusion that he was awarded the 42 hours.

14    Is that correct?  Is my understanding correct

15    on that?

16              HEARING OFFICER DOLKART: Yes, yes.

17              MR. HULL: Okay.  Okay.  May I

18    continue?

19              HEARING OFFICER DOLKART: Yes.

20              BY MR. HULL:

21        Q    Mr. Fernandez, so DCPS has

22    conceded that the 42 hours were awarded.  Was

 1   there any discussion as to when those hours

 2   would begin?

 3        A    Sure it was.

 4        Q    Okay.  What was that discussion?

 5        A    Within 30 days.

 6        Q    Okay.  Thirty days of the meeting

 7   or 30 days of some other date?

 8        A    Thirty days from the meeting day.

 9        Q    Now, that was right on the

10   beginning of the summer break.  Was that

11   discussed how that would impact the provision

12   of those services?

13        A    No, it was not.

14        Q    Okay.  And was the parent at this

15   meeting?

16        A    Yes, she was.

17        Q    Okay.  Now, calling your attention

18   to Exhibit 7, the last few pages there, those

19   notes.  Did you write those?

20        A    Yes, I did.

21        Q    When did you write those?

22        A    In that meeting, contemporaneous

1    to the meeting taking place.

2           Q    Okay.   Do those notes accurately

3    reflect what you remember happening at the

4    meeting?

5           A    Yes, they do.

6           Q    Okay.  As far as you know, did any

7    of those hours, were any of those hours

8    provided during the 30-day time line that was

9    set?

10          A    No, they were not.

11          Q    How do you know that?

12          A    From my interviews with the

13   regular ed teacher currently at Park View.  I

14   actually met her on parent/teacher conference

15   day.  And I talked to her and I asked her

16   about OT services.  And as far as she knew he

17   wasn't receiving -- well, he wasn't getting

18   pulled out and he wasn't receiving any OT.

19          Q    Okay.     And   when   was   that

20   discussion?

21          A    In  the  parent/teacher  conference

22   day.

41

```
1        Q     When was that?

2        A     I don't know the exact date.

3        Q     Was that this school year?

4        A     Yes, it was, of course.

5        Q     In   the   month   of   September   or

6    October?  If you don't remember --

7        A     I   don't   remember.    I   don't

8    remember.

9              HEARING   OFFICER   DOLKART:  He  said

10   he doesn't remember.

11             MR. HULL: Okay.

12             HEARING   OFFICER   DOLKART:  I'm  not

13   sure it makes that much difference.

14             BY MR. HULL:

15       Q     Well, okay.    Now,  the  30  days

16   would have run out on -- on or about July 25,

17   2007.

18       A     Correct.

19             MS. WILSON: Objection.  I mean, I

20   understand -- okay, I'm trying --

21             MR. HULL: Okay.  I can -- I can

22   withdrawal the question and get to my point.
```

42

1            HEARING  OFFICER  DOLKART:  Yes,  do

2    that.

3            BY MR. HULL:

4        Q    Do  you  know  if  those  hours  were

5    begun in the month of August?

6        A    No, they haven't begun.

7        Q    Okay.  At all, today?

8        A    At all, yes.

9        Q    Okay.  Now,  besides  those  hours

10    were there  other  hours  that  were  going  to  be

11    provided pursuant to any -- any sort of plan?

12        A    Right, the team --

13            MS.  WILSON:  Objection.    That's

14    outside  the  scope  of  the  complaint  of  what

15    we're here for.

16            HEARING  OFFICER  DOLKART:  I  don't

17    think it is given your argument about whether

18    they've  started  providing  the  comp  ed  yet  or

19    not.

20            MS. WILSON: Well, okay.

21            MR.  HULL:  Okay.    Please,  continue

22    with your answer.

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com

1          THE WITNESS: Oh, the team agreed

2    twice a week, 30 minutes. I think that's what

3    the report indicated.  And there was an OT

4    person from DCPS who agreed with those

5    recommendations.

6          BY MR. HULL:

7    Q    Okay.  And was that going to be

8    provided pursuant to an IEP or some other

9    document?

10   A    As far as we knew it was pursuant

11   to the 504 Plan.

12   Q    Did you actually receive a 504

13   Plan that day or develop one with the team?

14   A    No, we did not.

15   Q    Okay.  To date, have you seen a

16   504 Plan other than the notes from that

17   meeting?

18   A    No, I have not.

19          MR. HULL: Okay.  Thank you. I have

20   no further questions.

21          HEARING OFFICER DOLKART:  Ms.

22   Wilson.

1              MS. WILSON: Sure.

2                       CROSS-EXAMINATION

3              BY MS. WILSON:

4         Q    Mr. Fernandez, you said that you

5    didn't, you haven't seen one developed by the

6    team, but isn't it true that on November 19,

7    you will go to the school to continue

8    developing the 504 Plan?

9         A    I actually haven't received any

10   letters of invitation from Ms. Hunter

11   (phonetic). I don't know what meeting has

12   been scheduled. That's a surprise to me.

13        Q    So you're saying you personally

14   haven't received, but could you or are you

15   aware of your office having received any

16   letters?

17        A    No, I'm not. I'm not.

18        Q    You're not aware or --

19        A    No, it doesn't mean -- it doesn't

20   mean they haven't received it.

21        Q    Oh, okay.

22        A    Personally, I'm not.

45

```
 1          Q     Oh, okay.  So you're not refuting
 2     that in fact a letter could have been received
 3     by your office and a meeting scheduled?
 4          A     Well, sure I'm not.   It could
 5     have.
 6          Q     Okay.  All right, gotch you.  But
 7     is it your understanding that at some point
 8     you guys will come back to the, the team will
 9     come to the table to finish developing --
10               MR. HULL: Objection, relevance.
11               MS. WILSON: It was discussed --
12               MR. HULL: No, I meant the first
13     question.
14               HEARING   OFFICER   DOLKART:    I
15     overrule it.
16               MS. WILSON: I mean, we've talked
17     about that.
18               HEARING OFFICER DOLKART: Okay.  Go
19     ahead.  I've overruled it.
20               MS. WILSON: At some point, --
21               THE WITNESS: We will come back at
22     some point, yes.
```

1           MS. WILSON:  -- the team come back

2   to the table to --

3           THE WITNESS: Yes.

4           MS. WILSON: Okay, great.

5           BY MS. WILSON:

6       Q    And,   so   are   you   aware   of

7   Christopher receiving any occupational therapy

8   services while at Park View?

9       A    As far as I know, no.

10      Q    Okay.  And this is all based on

11  your conversation --

12      A    With the (inaudible) teacher.

13      Q    On   the   date   that   you   can't

14  remember.

15      A    Yes.

16      Q    Okay.  And your indulgence.   Let

17  me  just  write  this  down.   And are you aware

18  of, if Christopher attended summer school this

19  summer?

20      A    No, I'm not.

21      Q    You're  not  aware  or  he  didn't

22  attend?

```
1            A      As   far   as   I   know   he   did   not
2    attend.
3                  MS.   WILSON:   Okay.   So   he   didn't
4    attend summer school.  All right.  Thank you.
5     No further questions.
6                  HEARING   OFFICER   DOLKART:   Mr.
7    Fernandez,  do   you   actually   know   that
8    Christopher did not receive any OT services
9    during the month of August?  I mean do you
10   have actual knowledge of that?
11                 THE  WITNESS: Well, he wasn't in
12   summer school.  No, I don't.  To answer your
13   question, I don't.
14                 HEARING   OFFICER   DOLKART:   You
15   don't.  You also said you weren't even sure
16   whether or not he was in summer school.
17                 THE WITNESS: Right.
18                 HEARING OFFICER DOLKART: So really
19   what  --  what  you  know  is,  or  what  you
20   testified to is of the date that you went to,
21   that  you  spoke  with  his  teacher  at  the
22   parent/teacher conference day --
```

48

1                    THE WITNESS: Right.

2                    HEARING  OFFICER  DOLKART:  --  you

3    inquired about OT services --

4                    THE WITNESS: Right.

5                    HEARING  OFFICER  DOLKART:  --  and

6    were  told  that  as  far  as  this  teacher  knew

7    none were occurred.

8                    THE  WITNESS: Well, she's  the  only

9    teacher, yes.

10                   HEARING  OFFICER  DOLKART:  Right,

11   okay.

12                   THE WITNESS: So she would know --

13                   HEARING OFFICER DOLKART: Okay.

14                   THE  WITNESS:  --  if  he's  getting

15   pulled out.

16                   HEARING  OFFICER  DOLKART:  Is  --  is

17   Park View a DCPS school?

18                   THE WITNESS: Yes.

19                   HEARING  OFFICER  DOLKART:  It's  not

20   a chartered school?

21                   THE WITNESS: No.

22                   HEARING  OFFICER  DOLKART:  Okay.

1    That's it.

2              (Whereupon, the witness was excused.)

3                   MR. HULL: I'd like to call my next

4    witness.

5                   HEARING OFFICER DOLKART: Okay.

6                   MR. HULL: Now, I have Ms. Lopez

7    here.  She did an observation on or about

8    September 10.  Her testimony would be just as

9    part of her observation she -- she got

10   information that he struggles with handwriting

11   skills.  That would be the extent of her --

12                   MS. WILSON: I don't think that's

13   necessary.

14                   HEARING OFFICER DOLKART: I don't -

15   - I don't really see that that testimony is --

16   is necessary.  There's been a concession --

17                   MR. HULL: Okay.

18                   HEARING OFFICER DOLKART:  -- about

19   --

20                   MR. HULL: And that's why, so I

21   will -- I will forgo calling her and call the

22   parent to testify.

50

1                 MS. WILSON: I just wanted to note,

2      I mean, in terms of the concession, I mean,

3      that's never been a dispute.  So we're not

4      really conceding that.  I mean now, okay, he

5      needs it.  I mean, we said in June he needed,

6      so that's not really, just in terms of the --

7      the language.

8                 HEARING   OFFICER   DOLKART:    All

9      right.  I'll rephrase that.

10                MS. WILSON: Okay.

11                HEARING  OFFICER  DOLKART:  There --

12     there  is  no  dispute  about  the  fact  that

13     Christopher needs OT services.

14                MS. WILSON: Right.

15                HEARING OFFICER DOLKART: Okay.

16                MR.  HULL:  I'd  like  to  call  the

17     parent, Princess Watson to testify.

18                HEARING   OFFICER   DOLKART:   Okay.

19     Ms. Watson, would you please raise your right

20     hand?

21     WHEREUPON,

22                      PRINCESS WATSON

1    was called as a witness by Miguel Hull and was

2    examined and testified as follows:

3                    DIRECT EXAMINATION

4            BY MR. HULL:

5        Q    Could you state your full name for

6    the record, please?

7        A    Princess Watson.

8        Q    And you are Christopher Conrad's

9    mother?

10       A    Yes.

11       Q    And did you attend a meeting on

12   June 25, 2007?

13       A    Yes.

14       Q    And that was at Drew Elementary

15   School?

16       A    Yes.

17       Q    And during that meeting -- well,

18   DCPS has already conceded that they awarded 42

19   hours of comp OT services.  Do you remember

20   any time line being established as to when

21   those services would be begin?

22       A    Thirty days.

52

1          Q     Thirty days from when?

2          A     From the day of the meeting.

3          Q     Did anyone at the meeting talk to

4    you as to how they would begin those services

5    given that the summer was about to start?

6          A     They had an OT therapists onsite

7    that they could do it at the school.

8          Q     And did they tell you how that

9    would -- did anyone tell you how that would

10   begin?  That somebody would call you or --

11         A     That they would call.

12         Q     Okay.  And during those 30 days,

13   did your phone number change?

14         A     No.

15         Q     Did your address change?

16         A     No.

17         Q     Did anybody call you to --

18         A     No.

19         Q     -- take him down to the school for

20   those services?

21         A     No.

22         Q     Did you receive any letters

53

1    telling you to take him down --

2        A    No.

3        Q    -- for those services?  If you had

4    received a communication such as that, would

5    you have cooperated?

6        A    Yes.

7        Q    And during the month of August,

8    did you still have the same phone number?

9        A    Yes.

10        Q    And the same address?

11        A    Yes.

12        Q    Did anyone contact you --

13        A    No.

14        Q    -- from DCPS to bring him in for

15    those services?

16        A    No.

17        Q    Okay.  And he began at Park View

18    Elementary.

19        A    Yes.

20        Q    When did he begin there?

21        A    The first day of school.

22        Q    And was that because you moved or

54

1    for some other reason?

2           A    Yes, we moved.

3           Q    Okay.   Was DCPS notified of your

4    new address?

5           A    Yes.

6           Q    When did you notify them?   How

7    soon after you moved?

8           A    When I withdrew him from school in

9    August.

10          Q    Okay.   And since he began at Park

11   View -- well, let me ask you, do you go visit

12   Park View at all since he's been there?

13          A    I'm there every day.

14          Q    When you're there, is it just to

15   drop him off or for something else?

16               MS.   WILSON:   Objection   to   the

17   leading   questions.   We're   beyond   the

18   foundation.

19               MR. HULL: I'll rephrase.

20               HEARING  OFFICER  DOLKART:  Just  say

21   why is she there.

22               BY MR. HULL:

55

1       Q    Why -- why are you there?

2       A    To pick-up and drop-off and I

3  speak to the teacher right away every day.

4       Q    So, okay, so you get out of the

5  car and go into the building.

6       A    Yes.

7       Q    Okay.  How often -- so you speak

8  to her every day for how long?

9       A    Depends on the conversation.  It

10  may be 5, 10, 15 minutes.

11       Q    And is this the only teacher that

12  he has as far as you know?

13       A    Well, he has a teacher and an, I

14  believe, an aid that's in there.  I talk to

15  both of them.

16       Q    What are their names?

17       A    Ms. Dannis (phonetic) and Ms.

18  Davis (phonetic).

19       Q    As far as you know have either of

20  them told you anything about the OT services

21  being provided to your son?

22       A    No.

56

```
 1        Q     What  do  you  mean?    They  told  you

 2     nothing?

 3        A     No.    As  far  as  I  know,  they  don't

 4     know anything about therapy being done yet.

 5        Q     Have  you  asked  them  about  it?

 6        A     Yes,  I  did  mention  it  to  her.

 7        Q     And what -- what did they say?

 8        A     She  said  nobody  has  come  to  get

 9     him yet.

10        Q     Okay.    When  was  that?

11        A     The  last  time  I  discussed  it  with

12     her maybe roughly three-four weeks ago.

13        Q     Okay.    Have  you  talked  to  your  son

14     about this?

15        A     Yes.

16        Q     Has  he  told  you  whether  somebody

17     has  come  to  get  him?

18        A     He hasn't said anything about it.

19        Q     Okay.    Have  you  asked  him  if

20     somebody has come to get for OT?

21        A     Yes.

22        Q     And what does he say?
```

1       A     No.

2       Q     Okay.   Have you seen any documents

3   that would indicate to you that OT is being

4   provided?

5       A     Not at all.

6       Q     Do you still want this OT?

7       A     Yes.

8       Q     Do you want DCPS to provide the 42

9   or do you want it some other way?

10      A     Some other way.

11      Q     All right.   Do you want it to be

12  done privately?

13            MS. WILSON: I mean --

14            HEARING        OFFICER        DOLKART:

15  Sustained.

16            BY MR. HULL:

17      Q     All   right.   When   you   say   some

18  other way, what do you mean?

19      A     Independently by somebody else.

20      Q     Why?

21      A     Because they're taking too long.

22      Q     Okay.   What  is  your  understanding

1    of what OT is?

2          A    From when we had the meeting in

3    June, there was an OT therapist there.  We

4    discussed that his therapy would be for his,

5    for his handwriting, mostly for, like his fine

6    motor skills.  They're very undeveloped.

7                They have ways to help him with

8    his posture, so that he would sit up so he

9    could pay attention a little bit better.

10   There were things that were in there they said

11   he could have, I guess some free time, so that

12   he wouldn't get overwhelmed in the classroom.

13               And there were things to help him

14   like I guess (inaudible) and things to help

15   with his hands that he would be able use to

16   help him get, you know, to write better and

17   things in the classroom.  (Inaudible).

18         Q    Do you think he still needs that

19   kind of help?

20         A    Yes.

21               MR. HULL: Okay.  Thank you.  I

22   have no further questions.

59

1              HEARING   OFFICER   DOLKART:   Ms.

2    Wilson.

3              MS. WILSON: DCPS has no questions

4    for the witness.  And we just ask for just

5    that 30-second recess now so we can get our

6    witness.

7              HEARING   OFFICER   DOLKART:   Can   I

8    just ask one or two questions?

9              MS. WILSON: Sure.

10             HEARING   OFFICER   DOLKART:   Did   --

11   did you -- why -- why wasn't Christopher in

12   summer  school  for  the  summer?   I'm  just

13   curious.

14             THE   WITNESS:   Because   they   were

15   going to fail him.  And they didn't know what

16   grade to put him for summer school.

17             HEARING   OFFICER   DOLKART:   So   he

18   didn't go at all.

19             THE WITNESS: No.

20             HEARING   OFFICER   DOLKART:   Okay.

21   Thank you.  I think we are done.

22             (Whereupon, the witness was excused.)

1           HEARING OFFICER DOLKART: And we

2    will take a 30 second break at 1:03.

3           (Whereupon, proceedings in the

4    above-entitled matter went off the record at

5    1:03 p.m. and back on the record at 1:07 p.m.)

6           HEARING OFFICER DOLKART: We are

7    back on the record at 1:07 p.m.

8           MR. HULL: The parent rests her

9    case. Would like to reserve her right to call

10   any rebuttal witnesses if that becomes

11   necessary after DCPS presents its case?

12          HEARING OFFICER DOLKART: Well, you

13   have that right. Ms. Wilson.

14          MS. WILSON: Well, it won't be

15   necessary because unfortunately, our witness

16   still has not come back. I spoke to her prior

17   to this hearing. But, again, because of our

18   time shifting, I think she may have thought

19   that we weren't going forward, so she's not

20   available.

21          So what I would like to do is

22   again, it doesn't change, I mean, I certainly

1   would like to just note for the record with

2   the   hearing   officer   in   making   her

3   determination that DCPS provide documentation

4   within three business days of the commencement

5   of  the  occupational  therapy  services.   And

6   then if not, petitioner --

7               HEARING   OFFICER   DOLKART:   You're

8   proposing  that  whenever  it  is  you  start,

9   you'll let them know within three days --

10              MS. WILSON: No, no, no.   That  we

11  provide them within three business days of the

12  HOD  or  today's  date  documentation  that  the

13  occupational   therapy   services   have   begun.

14  That's  the  proposal.    Not  that  it's  just

15  whenever they start we'll let them know within

16  three days.

17              And  then,  if  not,  petitioner  is

18  entitled to those -- can get them --

19              HEARING OFFICER DOLKART: Let me --

20  let me just ask you, this isn't part of the

21  reg (inaudible).  Would you just proffer what

22  this witness was going to say that would --

62

1    that's relevant to this?

2              THE  WITNESS:  Sure.    The  witness

3    was  going  to,  which  is  the  special  education

4    coordinator  at  Park  View,  was  going  to  testify

5    about  her  conversations  with  the  occupational

6    therapist  who  is  a  consultant,  an  independent

7    contractor,  so  she's  not  an  occupational

8    therapist  for  Park  View,  two  weeks  ago  in

9    reference  to  the  commencement  of  services  of

10   the  42  hours  for  Christopher  and  the  services

11   being  provided  since  that  time  two  weeks  ago

12   to  date.

13              And  that  no  indication  or  no

14   reason  to  indicate  that  those  services  would

15   stop,  but  that  they  would  continue  until  the

16   completion  of  the  --

17              HEARING  OFFICER  DOLKART:    All

18   right.    So  you  --  so  you  agree  that  at  least

19   up  until  two  weeks  ago,  no  services  were  being

20   provided.

21              MS.  WILSON:  That  is  correct.

22              HEARING  OFFICER  DOLKART:  And  --

63

1    and she was going to testify that now they've

2    just started.

3                MS.   WILSON:   Two   weeks   ago,

4    correct.

5                HEARING   OFFICER   DOLKART:   Let   me

6    ask  another  question.   Is  there  a  --  any

7    dispute  as  to  whether  Christopher  should  be

8    receiving ongoing OT services?  That is to say

9    if he -- he didn't get 42 hours that he was

10   supposed to get last year.  But is he supposed

11   to be getting them continuing this year?

12               MR. HULL: Yes.

13               MS.   WILSON:   Well,   certainly   the

14   team -- yes.  And that was -- that's another

15   reason  for  the,  I  mean,  that's  in  the  notes

16   that   he's   going   to   receive   occupational

17   therapy services pursuant to a 504 Plan.

18               You  even  heard  testimony  from  the

19   witness that they are  --  that that, at least

20   his understanding that they would come back to

21   the  table  to  continue  to  develop  that  plan.

22   And that's what I, the meeting is, for that is

64

1  scheduled, so, yes.

2          HEARING OFFICER DOLKART: Well, but

3  here's -- here's my issue. Whether or not

4  there's a written 504 Plan or not, if he was

5  to get -- let's leave the 42 hours aside,

6  okay. Leave it aside.

7          If he was to continue to get OT

8  therapy, you know, starting when he went back

9  to school, then he, at this point, he hasn't

10 gotten his regular therapy and he hasn't

11 gotten the 42 weeks.

12         MS. WILSON: That is correct.

13         HEARING OFFICER DOLKART: Is that -

14 - is that accurate?

15         MR. HULL: That's my understanding.

16         MS. WILSON: That is correct.

17         MR. HULL: And -- and the concern

18 also is I didn't raise that for this issue.

19 But, of course, if you'd like to address it,

20 I'm not going to object.

21         HEARING OFFICER DOLKART: I don't

22 want to see you back here on that issue.

1              MR. HULL: Well, that's just it.

2              HEARING OFFICER DOLKART: I'm going

3     to tell you that right now.

4              MR. HULL: But -- but when I filed

5     this complaint, the school year hadn't begun,

6     so I couldn't have anticipated that issue.

7     Now, I know there have been some -- some back-

8     and-forth communications to try and set a

9     meeting.  We're going to do our best to follow

10    through.

11             As far as I know, we don't have a

12    firm date yet.  Maybe we could raise that and

13    take care of it then.  I can't promise you

14    that we're not going to walk away -- the

15    parent won't walk away angry and want me to

16    file a complaint on that issue.

17             MS. WILSON: Well, there is a firm

18    date.  I mean, so --

19             MR. HULL: See I'm not sure.  We

20    can ask the parent, but I'm not sure -- oh,

21    well.

22             MS.    WILSON:    This    is    your

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1  signature.

2          MR.   HULL:   Well,   let   me   just

3  confirm that.

4          HEARING   OFFICER   DOLKART:   But   we

5  know how many --

6          MR. HULL: Well, here we are saying

7  --

8          MS.   WILSON:   Here's   the

9  confirmation behind it.

10          MR. HULL: No, no.  Well, this is

11  done  with  the  help  of  my  assistant.   But

12  that's great then.  So, hopefully, that issue

13  --

14          HEARING   OFFICER   DOLKART:   So   what

15  is the date?

16          MS. WILSON: November 19 at 10:30.

17   And here's the confirmation meeting behind it

18  from DCPS.

19          MR. HULL: Well, even better then.

20   But  today  was  for  the  42  hours,  not  the

21  regular hours.  And --

22          HEARING   OFFICER   DOLKART:   I   know,

1    but in determining what relief is needed and

2    taking into account, because I'm going to,

3    that -- that I'm going to assume that Ms.

4    Wilson is -- is telling the truth and that

5    sometime exceedingly recently OT services

6    either began or are about to.

7                MS. WILSON: Right, I mean, we're

8    not --

9                HEARING OFFICER DOLKART: And

10   that's not, but that doesn't, that's -- that's

11   the services --

12               MS. WILSON: For the comp ed plan.

13               HEARING OFFICER DOLKART: -- that

14   he should have been getting all along. Well,

15   --

16               MS. WILSON: Right.

17               HEARING OFFICER DOLKART: I mean

18   however you say, comp ed or not comp ed, --

19               MR. HULL: We don't know which --

20   which services it is.

21               HEARING OFFICER DOLKART: -- the

22   fact of the matter is --

1           MS. WILSON: Right.

2           HEARING OFFICER DOLKART: -- that

3    at this point he's missed some more services -

4    -

5           MR. HULL: Yes.

6           HEARING OFFICER DOLKART: -- he

7    could have gotten.

8           MR. HULL: Yes.

9           HEARING OFFICER DOLKART: Perhaps,

10   and I just want -- I want to get it all done.

11    I mean, I see no reason in filing another

12   complaint to say that he's entitled to more

13   comp ed -- comp ed because he didn't get the

14   services from the start of the school year

15   until whenever they finally started.

16          MS. WILSON: Right, understood.

17   The only problem though with going beyond this

18   complaint is that even if you do want to get

19   it all done, unfortunately, through no fault

20   of counsel's own or just the nature of our

21   jurisdiction, that's no guarantee that it is

22   going to be all done even for ancillary issues

69

1    to this -- to this particular issue.  So --

2                 HEARING  OFFICER  DOLKART:  Meaning

3    there may end up being more problems.  Is that

4    what you're saying?  That I know.

5                 MS.  WILSON:  No,  no,  no.    But

6    there's  a  high  likelihood  that  there'll  be

7    more  complaints  even  surrounding,  maybe  not

8    the  42  hours,  but  the,  I  mean,  I  just  --  I

9    just have a problem with --

10                HEARING    OFFICER    DOLKART:    I

11   understand.  I understand, but --

12                MS.  WILSON:  -- because  then  we  go

13   beyond  that  and  then  they  still  come  back

14   anyway.  Not, I'm saying, the collective day.

15                HEARING  OFFICER  DOLKART:  Well,  I'm

16   going  to  make  a  ruling.   I'm  going  to  make  a

17   ruling  about  where  the  services  are  going  to

18   be  provided  and  how  much  they're  entitled  to

19   that  --  I  am  sure  there  will  be  other  issues,

20   but  it  should  take  care  of  OT  through  today.

21   You  know  that  may  not  happen,  but  that  is  my

22   endeavor  because  I  would  rather  see  fewer

1   complaints and more services provided.

2             MR. HULL: I'm not going to oppose

3   you going that extra stretch.

4             MS. WILSON: Right, of course,

5   right.  I mean he's not going to, but I mean

6   that's my whole thing.  I mean, it just --

7   while I understand what the hearing officer is

8   trying to do and what your hope is, and I

9   certainly -- that's my hope too, I'm just not

10  very -- just given -- perhaps I'm jaded.

11            I'm not very -- I'm fairly

12  confident that what you're trying to do is not

13  going to accomplish what you want it to

14  accomplish.  And therefore, that's another

15  reason why I would object to going beyond the

16  complaint.  I mean, so I just want to note

17  that for the record.

18            MR. HULL: I'm also, although, I

19  don't doubt Ms. Wilson's honesty as an

20  attorney, she was proffering what somebody

21  else was going to testify.  And I do, it's not

22  that I believe it was going to be Ms. Hunter,

1  and I don't know Ms. Hunter well enough.  I'm

2  not going to cast dispersions on anybody, but

3  I don't -- I object to the proffer, not

4  because Ms. Wilson said it, but because it's

5  something that Ms. Hunter would have said.

6           HEARING OFFICER DOLKART: Well, let

7  me suggest to you that the order is going to

8  be written in such a way that I'm not going to

9  assume that services have started --

10          MR. HULL: Okay.

11          HEARING  OFFICER  DOLKART:  --  or

12 have not started within some small period of

13 time that no one for without a witness can

14 say.  I'm going to write it in such a way that

15 it will cover whether it started or whether it

16 hasn't yet started.

17          MR. HULL: That would be great.

18          MS. WILSON: Okay, great.

19          HEARING  OFFICER  DOLKART:  Okay.

20 All right.  I obviously do not need closing

21 arguments.

22          MS. WILSON: Okay.

72

1              HEARING   OFFICER   DOLKART:   Thank

2    you.

3              MS. WILSON: Thank you.

4              MR. HULL: But you still want the -

5    - the written submission.

6              HEARING   OFFICER   DOLKART:   I   do

7    because if I don't have jurisdiction then we

8    have been here for not.

9              MR. HULL: Thank you.  So I'll have

10   it  to  you  close  of  business  Friday,  this

11   Friday.

12             HEARING  OFFICER  DOLKART: You  have

13   to  realize  I  was  a  civil  procedure  professor

14   before this.  I understand about jurisdiction.

15             MR.  HULL: I'll  spread  the  word  of

16   my colleagues.

17             HEARING   OFFICER   DOLKART:   Okay.

18   The  hearing  is  ended  at  1:16  p.m.  And  I'll

19   shall  get  submissions  by  Friday,  which  would

20   be November --

21             PARTICIPANT: 2nd.

22             HEARING OFFICER DOLKART: 2nd.

73

1          PARTICIPANT: Yes.

2          HEARING    OFFICER    DOLKART:

3    Concerning  the  jurisdictional  issues.    Thank

4    you all.

5          (Whereupon,   proceedings   in   the

6    above-entitled  matter  was  concluded  at  1:16

7    p.m. on October 30, 2007.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22